Oscar E. **BUDER** and Eugenia H. Buder,
Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

No. 61C 35(1).

United States District Court
E. D. Missouri, E. D.

July 24, 1963.

Buder & Martin, Leonard E. Martin, St. Louis, Mo., for plaintiffs.

John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for defendant.

HARPER, Chief Judge.

This action was instituted by the plaintiffs, Oscar E. Buder and Eugenia H. Buder, to recover income taxes and interest allegedly overpaid for the years 1955 and 1956 in the respective amounts of $10,194.68 and $9,081.88 plus statutory interest thereon. Computed on the basis of paragraph 11 of the Stipulation filed with this court, the claim for overpaid taxes for 1955 was reduced to $9,632.20. By the amended complaint, the claim for overpaid taxes for 1956 was increased to $10,240.93, which amount, when computed on the basis of paragraph 12 of the Stipulation, was corrected to $10,240.81.

Some of the facts have been stipulated and are found accordingly.

The plaintiffs filed a timely federal income tax return for the year 1955, which was subsequently amended. The second amended return, dated June 30, 1956, is in the record as Exhibit A. On Schedule 1 of the said second amended return, the plaintiffs claimed as a deduction the sum of $13,229.93, identified as "Buder vs. Buder Litigation—Legal Expenses." By the terms of paragraph 11 of the Stipulation, this claimed deduction was reduced to $12,479.95.

Upon audit of the said return, the Commissioner disallowed the aforesaid deduction which, together with other adjustments not disputed herein, led to

the assessment of a tax deficiency for the year 1955 of $14,937.86. This amount, plus assessed interest of $1,934.45, or a total of $16,872.31, was paid by the plaintiffs on June 11, 1958.

The plaintiffs filed a timely federal income tax return for the year 1956, Exhibit B. On Schedule C of the said return, the plaintiffs claimed as a deduction the sum of $10,965.00, identified as "Rebuilding portions of Buder and Buder books," and, on page 2 of the said return, further claimed as a deduction the sum of $308.17, identified as "Litigation—Buder vs. Buder." By the amended complaint filed by leave of court, as slightly reduced by paragraph 12 of the Stipulation, the latter claimed deduction was increased to $1,793.98.

Upon audit of the said return, the Commissioner disallowed the above deductions which, together with other adjustments not disputed herein, led to the assessment of a tax deficiency for the year 1956 of $24,799.66. This amount, plus assessed interest of $1,723.60, or a total of $26,523.26, was paid by the plaintiffs on June 11, 1958.

On June 2, 1960, the plaintiffs filed claims for refund of the taxes and interest allegedly overpaid for the years 1955 and 1956 in the respective amounts of $10,194.68 and $9,081.88. The amount of taxes and interest claimed by the plaintiffs represent the portion of the tax assessment for the years 1955 and 1956 attributable to the Commissioner's disallowance of the deductions. On January 8, 1962, the plaintiffs filed an amended claim for refund of the taxes and interest allegedly overpaid for the year 1956 in the amount of $10,240.93.

The plaintiffs timely filed the instant action and have otherwise complied with all statutory prerequisites to the institution of suit. The court has jurisdiction over this action under 28 U.S.C.A. § 1346(a) (1).[1]

This suit is an outgrowth of expenses entailed by Oscar Buder in an action entitled Oscar E. Buder v. Gustavus A. Buder, et al., Docket No. 93,848C (Circuit Court of St. Louis, Division No. 3). This state court action is still pending.

A short summary of events leading to the aforementioned litigation is necessary. Oscar E. Buder and G. A. Buder, brothers, were partners under the firm name of Buder and Buder from January 1, 1908, until the institution of the state court action in January of 1946. Each partner had a one-half interest in the firm with equal rights in the conduct of the business and the assets acquired. There were no written articles of partnership and no agreement as to how long it should continue. The scope of the firm's business is in conflict. However, it can be said that the original purpose for which the partnership was formed included the practice of law and investment of surplus proceeds in stock of the Burroughs Company. Each partner received a certain amount of draw and all money in excess thereof was to accumulate and be invested, apparently originally just in Burroughs Company stock. According to the testimony of Oscar Buder, he was the active member of the firm handling the preparation and trial of lawsuits, and G. A. Buder operated the firm office, employed all necessary help, supervised and directed the keeping of books and records, made all investments, had possession and control of the assets of the firm, and acted as attorney and counselor for many corporations and other clients. Around 1938, Oscar Buder became suspicious of his partner, the reasons for which are unnecessary to elaborate, and from that time on collected evidence until he felt he had enough to file suit against his brother.

Oscar Buder filed suit on January 2, 1946, against his brother and former law partner, Gustavus A. Buder, Sr., and the

---

1. Although, at one time, there were questions as to the timeliness of the said amended claim for refund and of the additional claim set forth in the amended complaint, and of the court's jurisdiction thereover, these questions have been resolved in favor of the taxpayer, leaving no procedural or jurisdictional questions. (Page 5 of Defendant's Brief.)

First National Bank of St. Louis. The original petition sought an accounting of the affairs of the partnership of Buder and Buder. It was alleged that each partner had a one-half interest and that plaintiff had dissolved the partnership as of January 1, 1946. On November 13, 1953, the Bank filed answer to the second amended petition in the case, in the nature of interpleader, joining Pontiac Realty Company as a third-party defendant to assert its interest in property held by the Bank as collateral to a note of Pontiac. The Bank was permitted by consent to deliver this collateral into the registry of the court and the case was dismissed as to it, leaving G. A. Buder and Pontiac. G. A. Buder died on April 14, 1954, and on May 19th, G. A. Buder, Jr., his executor, was substituted as defendant.

In January, 1955, on motion of G. A. Buder, Jr., executor, Acreage Realty Company was made a defendant by consent of plaintiff, "on the ground assets of the Acreage Realty Company are intermingled with the assets of the firm of Buder & Buder."

On September 7, 1954, plaintiff filed a supplemental petition to his second amended petition to bring in Arcadia Realty Company, Arc Realty Company, Arcadia Timber Company, Lydiade Investment Trust, and Gustavus A. Buder, Jr., as additional defendants. This supplemental petition was dismissed without prejudice on September 5, 1956, and on October 15, 1956, plaintiff filed motion for leave to file his third amended petition making the aforementioned additional defendants as defendants, and this motion was granted on February 15, 1957. Motions to strike and to dismiss the third amended petition were overruled.

Pontiac, Arcadia Realty, Arc Realty, Lydiade and G. A. Buder, Jr., brought an original proceeding in the Supreme Court of Missouri to prohibit the court from proceeding in the aforementioned suit for partnership accounting. State ex rel. Pontiac Realty Co. v. Nangle, Mo., 315 S.W.2d 214. Prohibition was denied,

the effect being that the defendants were required to stay in the case. Oscar Buder in the state court suit was and is seeking assets allegedly diverted to these additional defendants, actually and primarily in the form of stock of the Burroughs Corporation, formerly Burroughs Adding Machine Company, allegedly purchased and put in their names out of the earnings and profits of Buder & Buder.

It is the plaintiffs' contention that the expenditures herein claimed as deductions, which were stipulated to and listed in detail in paragraph 11 of the Stipulation of Facts filed by the parties as to the year 1955, and paragraph 12 for the year 1956, were incurred in connection with the aforesaid litigation in the state court; that the said state court action constitutes a suit for an accounting of partnership assets; and that, therefore, all expenditures incurred by the plaintiffs in connection with the said state court litigation are deductible from income either as a business expense under Section 162 of the Internal Revenue Code of 1954, or as a non-business expense under Section 212 of the Internal Revenue Code of 1954.

The defendant contends that the state court litigation between the Buder brothers encompasses more than an accounting of partnership assets; that a number of the issues in the said state court litigation relate to the personal affairs of the respective brothers which are not directly related to the dissolved partnership; that a number of issues in the said state court litigation constitute a claim of title or a defense of title to property of the respective brothers; that the expenditures attributable to such issues are either personal expenditures or capital expenditures which are not deductible from income; and that before the plaintiffs can deduct any part of the claimed expenditures, they must demonstrate to what extent such expenditures constitute allowable deductions under Section 162 or 212 of the Internal Revenue Code of 1954.

The state court litigation has been classified as an accounting for the profits

and assets of the partnership of Buder & Buder. The petitions filed in that litigation have demanded an accounting with respect to the partnership affairs. The problem arises, of course, as to whether or not these classifications and captions are correct. Undoubtedly, *some* portion of the expenses incurred by the taxpayers in connection with the state court litigation are deductible under Section 162 as ordinary and necessary business expenses. However, can *all* of these expenses be deducted under Section 162? What criteria can be applied to determine whether or not these expenses can be deducted in toto under Section 162?

In Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505, the court held that expenditures for attorney's fees made to retain the earnings of a business were deductible under Section 214(a) (1). The court's reasoning, simply stated, was that expenditures for attorney's fees made to retain earnings of the business after their receipt, like such expenditures to secure payment of the earnings of the business, were *directly connected with the business* and that such expenditures were both *ordinary* and *necessary.*

Taxpayers rely on other cases expounding the primary purpose rule. They are: Rassenfoss v. Com. of Int. Rev., 7 Cir., 158 F.2d 764; Industrial Aggregate Co. v. United States, 8 Cir., 284 F.2d 639; and Gravois Planing Mill Co. v. Com. of Int. Rev., 8 Cir., 299 F.2d 199.

As stated in Rassenfoss, supra, 158 F.2d l. c. 767: " * * * the main and primary purpose of the suit which petitioner defended was for an accounting and any question of title was merely incidental thereto." Following therefrom, it was concluded [in Rassenfoss] that the expenditures were *ordinary* and *necessary, paid in carrying on a trade or business,* and, therefore, were properly deductible. Gravois, supra, expounds the so denominable dominant aspect theory.

■ The cases relied on by the taxpayers indicate the applicable criteria. The expenses must be both ordinary and necessary. What makes them so can be gleaned from the cases and would be fruitless to reiterate. But the rule is that the matters involved for which the expenses are incurred must be *directly connected with the business.* If there are other matters involved in the suit, the primary purpose rule is applied.

■ The primary purpose rule and the dominant aspect rule, simply stated, involves looking at a transaction and determining the primary or dominant aspect and then determining whether the additional transactions, although when viewed separately might in themselves look different, are necessary concomitants to the primary or dominant aspect.

■ As the defendant states, and this court agrees, we have no quarrel with the general propositions set forth in these cases and relied on by the taxpayers. But, can the state court litigation be tied into a neat package that would fit into Section 162? This court finds that the answer is clearly in the negative. In the case at bar we are dealing with a myriad of transactions, some of which undoubtedly fall within the purview of Kornhauser, supra, and the other cases cited, and are deductible under Section 162. But, on the other hand, some of the transactions to be specified later, although carried on the partnership books, were not *directly* connected with the business and could not be considered as necessary concomitants to an accounting suit. They had nothing to do with the relationship of the partnership and consequently must be dealt with separately. Gravois, supra, looked at the dominant aspect but found nothing in record to justify a conclusion that any part of the expenses was for the benefit of Beckemeier personally.

■ The fact that these items were carried on the books of the partnership does make them connected with the other affairs of the partnership, but not so as to be directly connected with the partnership business. To hold so would be improper, as these items involve issues relating to the personal affairs of the taxpayers and did not arise from the tax-

payers' profit-seeking activities, as will be set forth later.

The plaintiffs next contend that to the extent that all the expenses are not deductible under Section 162, they are deductible as ordinary and necessary expenses for the management, conservation or maintenance of property held for the production of income under Section 212 of the Internal Revenue Code of 1954. Section 212 comes into this case on the theory that Oscar E. Buder as a partner was constructively in possession of the partnership assets and may still be constructively in possession thereof, and is trying to conserve and maintain his share thereof · as income-producing property.

It has been shown subject to later specification that there are items involved in the state court litigation that do not arise directly from carrying on a business or trade. The present issue touches upon these remaining items and the plaintiffs would have us classify them as falling within the above named section. Before plunging head-on into the contentions on both sides, it is wise to review the applicable criteria for determining this issue.

The Supreme Court of the United States granted certiorari to the United States Court of Claims in United States v. Gilmore, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570, decided February 18, 1963. In Gilmore, the respondent sued for refund of part of the income taxes paid by him for the years 1953 and 1954, on the ground that legal expenses incurred by him in defending divorce litigation with his former wife were deductible under Section 23(a) (2) of the Internal Revenue Code of 1939, as amended, which allows as deductions from gross income "ordinary and necessary expenses * * * incurred * * * for the conservation * * * of property held for the production of income." His gross income was derived almost entirely from his salary as president of three corporations which were franchised automobile dealers and from dividends from his controlling stock in such corporations. His wife had sued for divorce, alimony and an alleged community property interest in such stock, and he alleged that had he not succeeded in defeating these claims he might have lost his stock, his corporate positions and the dealer franchises, from which nearly all of his income was derived. The court held with two dissents that none of respondent's expenditures in resisting these claims were deductible under Section 23(a) (2).

The court considered the fact that prior to 1942 under Section 23(a) (1) the activities of an individual in supervising his own securities investments did not constitute the "carrying on any trade or business," and hence expenses incurred in connection with such activities were not tax deductible. The Revenue Act of 1942 added Section 23(a) (2), allowing the disallowance of expense deductions in respect of such profit-seeking activities. The court stated, 372 U.S. l. c. 45, 83 S.Ct. 627, 9 L.Ed.2d 570, that it had held in Trust of Bingham v. Com. of Int. Rev., 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670, that "§ 23(a) (2) 'is comparable and *in pari materia* with § 23(a) (1),' providing for a class of deductions 'coextensive with the business deductions allowed by § 23(a) (1), except for' the requirement that the income-producing activity qualify as a trade or business."

The court continued, 372 U.S. l. c. 45 and 46, 83 S.Ct. 627 and 628, 9 L.Ed.2d 570:

"A basic restriction upon the availability of a § 23(a) (1) deduction is that the expense item involved must be one that has a business origin. That restriction not only inheres in the language of § 23(a) (1) itself, confining such deductions to 'expenses * * * incurred * * in carrying on any trade or business,' but also follows from § 24(a) (1), expressly rendering nondeductible 'in any case * * * [p]ersonal, living, or family expenses.' See note 9, supra. In light of what has already been said with respect to the advent and thrust of § 23(a) (2), it is clear that the '[p]ersonal * * *

or family expenses' restriction of § 24(a) (1) must impose the same limitation upon the reach of § 23(a) (2)—in other words that the only kind of expenses deductible under § 23(a) (2) are those that relate to a 'business,' that is, profit-seeking, purpose."

After reviewing Kornhauser, supra, and Deputy v. Du Pont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416, the court continued, 372 U.S. l. c. 48, 83 S.Ct. 629, 9 L.Ed.2d 570: "The principle we derive from these cases is that the characterization, as 'business' or 'personal,' of the litigation costs of resisting a claim depends on whether or not the claim *arises in connection* with the taxpayer's profit-seeking activities." The court determined, as can already be ascertained, that " * * * it was manifestly Congress' purpose with respect to deductibility to place all income-producing activities on an equal footing." 372 U.S. l. c. 49, 83 S.Ct. 629, 9 L.Ed.2d 570. The court held, 372 U.S. l. c. 49, 83 S.Ct. 629, 9 L.Ed.2d 570, that " * * * the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal' and hence whether it is deductible or not under § 23(a) (2)."

■ From the foregoing a short summary of the applicable criteria appears. To determine whether or not the expenses involved fall within Section 162 or Section 212, the court must look at the origin and character of the claim with respect to which the expense was incurred. Then it must be ascertained if the claim arises in connection with the taxpayers' profit-seeking activities. If so, the expense is deductible under Section 212. If, in addition, the income-producing activity qualifies as a trade or business it is deductible under Section 162. Under neither section is there a requirement that the expenses be for the production of income; it is the *activity* that must be profit-seeking. Trust of Bingham, supra.

At page 374 of 325 U.S., at page 1237 of 65 S.Ct., 89 L.Ed. 1670 the court said, "Section 23(a) (2) thus treats the trust as an entity for producing income comparable to a business enterprise, and like § 23(a) (1) permits deductions of management expenses of the trust, even though the particular expense was not an expense directly producing income."

■ Applying this criteria to the case at bar, Section 212 does not enter the case, as those items which have been classified as personal did not arise from the taxpayers' profit-seeking activities, and the remainder classified as business is deductible under Section 162.

It has been held that some of the claims involved in the state court litigation do not fall within Section 162 nor 212, and it has been shown why all the expenses are not deductible under these sections. This holding was subject to later specification. In determining what sections each claim falls under, not only must the petition be looked at, but all the counterclaims must be included. A question arises concerning the pleadings the court must use as a base for this determination. The years in question are 1955 and 1956. The second amended petition was in full force and effect during both years. A supplemental petition had been filed on September 7, 1954; however, it was dismissed without prejudice on September 5, 1956. On October 15, 1956, plaintiff filed a motion for leave to file his third amended petition. This motion was granted on February 15, 1957.

■ Taxpayers in the case at bar used the second amended petition as their base in distinguishing what they call individual business items from partnership business items. Of course, along with this the supplemental petition must be considered. This court will go along with this as a base since the proceedings were always under the second amended petition for the years in question, and although the third amended petition was lodged with the court in at least some part of the years in question, leave was not granted to file it until 1957. If, after this allocation is made, namely, those

claims which do not fall within Section 162 or Section 212, the court finds that some or all of the expenses incurred in the state court litigation involved work in connection with claims under the third amended petition and that such claims are new and have not been classified or are new ones contained in the second amended petition and for some reason a new classification is suggested, this court will deal with such issues. The answers and replies to the third amended petition have not been considered in formulating the base, as the evidence is clear that none of the expenses deducted for the years here involved were for work in connection with those claims.

For reference purposes the following in substance is what is alleged in Oscar's second amended petition with annotations to the third amended petition (the numbers referring to paragraphs as designated in the petitions):

4): That decedent has failed to account for $96,500 in bonds of the Evens & Howard Firebrick Company, and for $59,000 in proceeds from the redemption of other bonds, all borrowed from Oscar by decedent for his own use on or prior to October 9, 1930. (Paragraph 40 of the Third Amended Petition is the same as this paragraph.)

5): That in about November, 1935, decedent pledged to defendant, the First National Bank in St. Louis, as collateral for a loan to decedent or to Pontiac Realty Company (a corporation owned by decedent) the $96,500 of Evens & Howard Firebrick Company bonds belonging to Oscar; that decedent's loan was also secured by various notes of Acreage Realty Company (a corporation owned equally by Oscar and decedent); that decedent has not stated by what authority he pledged such collaterals; and that defendant bank should be required to marshal the assets securing the loan and exhaust all collateral belonging to decedent or Pontiac Realty Company before resorting to Oscar's property. (See paragraph 41 of the Third Amended Petition.) The allegations are somewhat changed from the second amended peti-

tion. It is alleged that the loan was to Pontiac Realty Company, of which decedent was president. Additional collateral was pledged in the form of a note owned by Buder & Buder for $30,000 executed by G. A. Franz. Also, the First National Bank has since been discharged and has placed in the court all the funds and collateral then in its possession. Nothing is alleged about decedent's authority to pledge such collaterals.

6): That Oscar is the owner of 2,412 shares of General Refractories Company stock which decedent received in exchange for the $96,500 bonds of Evens & Howard Firebrick Company and Oscar is entitled to the stock with dividends thereon since May 1, 1936, and interest at six percent on the dividends. (See paragraph 43 of the Third Amended Petition where it is alleged that decedent has accounted for twelve shares of said General Refractories stock, but not the remaining 2,400 shares, and that said stock through the increase by way of stock dividends consists of 6,615 shares.)

7): That prior to December 12, 1936, Oscar requested decedent to sell 2,000 of the 2,412 shares of General Refractories stock when the market price was $60 per share and that decedent failed to do so and is liable to Oscar for the amount that a sale would have brought on that date with interest at six percent. This allegation has been abandoned by Oscar E. Buder.

8): That decedent owes Oscar $23,401.34 with interest at six percent from November 8, 1935, resulting from decedent's failure to give Oscar proper credit on payments made by the latter on a consolidated debt owed by the two to the Mercantile Bank & Trust Company. (See paragraph 44 of the Third Amended Petition for relatively the same allegations.)

9): That Oscar pledged with the Mercantile Bank & Trust Company, in addition to other collateral, 21,000 shares of Burroughs Adding Machine stock and 1,500 shares of General Refractories stock, and that on October 12, 1935, decedent received from this bank a cer-

tificate for 800 shares of General Refractories stock which decedent has failed to return to Oscar. (See paragraph 45 of the Third Amended Petition for relatively the same allegations.)

10): That decedent has failed to account for 1,300 shares of Burroughs stock with dividends thereon from December 4, 1933, and that decedent is entitled to an offsetting credit of $9,333.33. (See paragraph 46 of the Third Amended Petition for relatively the same allegations.)

11): That decedent has failed to distribute to Oscar his (Oscar's) share in the estate of Susan R. Buder, which share consists of $20,639.85 principal and $31,771.44 of accrued interest. (See paragraph 47 of the Third Amended Petition for relatively the same allegations.)

12): That partnership accounts, Clients' Accounts Receivable and Credit Balances due Clients, have not been properly maintained, with the result that actual accounts receivable and payable will probably never be received or paid; that, therefore, such accounts should be closed and charged one-half to each of the partners with certain exceptions; and that consequently decedent owes the partnership $241,874.51 and the partnership owes Oscar $241,874.51, with interest at six percent from January 1, 1946. (See paragraph 30 of the Third Amended Petition which states substantially the same allegations but does not ask that the accounting be closed.)

13): That decedent improperly charged Oscar's cash collection account on the partnership's books with the purchase of a $25,000 loan which is worthless. Therefore, decedent owes Oscar $25,000 with six percent interest from January 1, 1946.

14): That decedent wrongfully removed a $75,000 credit from Oscar's cash collection account on the partnership's books; and that, therefore, decedent is indebted to Oscar for $75,000 with six percent interest from January 1, 1946. (See paragraph 48 for a more detailed explanation of what is alleged.)

15): That decedent wrongfully removed $70,000 from a partnership income account, and, as a result, decedent is indebted to Oscar for $35,000 with six percent interest from January 1, 1946.

16): That the balance due the partnership from decedent for fees earned is $13,204.57 and $52,897.01; and, therefore, Oscar is entitled to one-half of such sums, or $33,050.79, with six percent interest from January 1, 1946. (See paragraph 49 of the Third Amended Petition for relatively the same allegations.)

17): That decedent hypothecated a $30,000 note belonging to the partnership as collateral for a loan to Pontiac Realty; that decedent has failed to account for the proceeds of the note, being 1,715 shares of Burroughs stock and $2,237.50 paid as interest; and that, therefore, Oscar is entitled to one-half of each item with dividends on the stock and six percent interest on the interest payment from the date of receipt. (See paragraph 50 of the Third Amended Petition. Paragraph 50 contains in essence the same allegations as paragraph 17; however, it is alleged that Pontiac Realty Company received the stock, and that since the filing of the second amended petition Pontiac has placed the stock, interest and dividends in the hands of the court.)

18): That decedent improperly caused the partnership's books to show a debt of $3,951.85 owing by one Herman Becker; that said sum is actually owed by decedent; and that, therefore, Oscar is entitled to $1,975.92 with six percent interest from January 1, 1946. (See paragraph 51 of the Third Amended Petition for substantially the same allegations.)

19): That decedent improperly caused the partnership's books to show a $7,694.25 charge to the account of William E. Buder; that this sum represents an amount decedent loaned to a corporation owned by himself; and that, therefore, decedent owes Oscar $3,847.12 with six percent interest from January 1, 1956. (See paragraph 52 of the Third Amended Petition for substantially the same allegations.)

20): That decedent improperly charged against' the partnership a personal expense of $14,283.55; and that, therefore, decedent is indebted to Oscar for $7,141.77 with six percent interest from January 1, 1946. (For substantially the same allegations see paragraph 53 of the Third Amended Petition.)

21): That decedent was using for his own purposes from the partnership's funds $261,372.82 and that decedent must account for the profits arising out of the use of this money; and that, therefore, decedent is indebted to Oscar for one-half of the profits with six percent thereon from January 1, 1946. (Paragraph 54 of the Third Amended Petition alleges an additional $250,000 item that G. A. Buder credited to his own personal cash collection account. Paragraph 54 seeks an audit and accounting of the cash collection account of G. A. Buder to determine the amount of said funds converted to the use of G. A. Buder.)

22): That it has been necessary for Oscar to keep separate accounting of his partnership's affairs since October, 1941, and Oscar files herewith a true account of his cash collections and disbursements and asks the court to approve same. (See paragraph 58 of the Third Amended Petition.)

23): That Oscar is the equitable owner of 12,100 shares of common and one-half of the preferred stock of the Arcadia Refining Company now held by decedent or his nominees, which stock was acquired with partnership funds. (See paragraph 37, 38 and 39 of the Third Amended Petition.)

24, 25 and 26): That unless satisfactory arrangements can be made for free access of the partnership's books, the handling of the partnership mail, and collection and handling of partnership accounts receivable, the court will have to appoint a custodian or receiver. (See paragraph 59 of the Third Amended Petition in reference to paragraph 26.)

Decedent filed an answer and counterclaim to the second amended petition on October 14, 1952. In this pleading, decedent admitted the allegations in paragraphs 19 and 20 of the second amended petition and denied all the other substantive allegations, and as further defenses alleged as follows (the numbered paragraphs corresponding to the numbers in the pleading):

16): Decedent is entitled to retain or be credited with fees earned by him as executor for the estates of Jacob Stocke and Sophie Franz in the amounts of $5,993.72 and $43,069.95, inasmuch as the two partners had agreed that each would retain or receive credit for executor's fees earned by the individual partner.

23): Oscar is guilty of laches so as to prevent him from claiming ownership of any of the Arcadia Refining stock because Oscar failed to claim ownership or institute legal suit to establish ownership to any of the stock prior to the present suit.

In addition, decedent asserted as counterclaims the following (the numbered counts corresponding with the pleading):

*Count 1:* Decedent has made payments in excess of $122,964.60 for the benefit of Oscar in reduction of Oscar's portion of a joint indebtedness owed by Oscar and decedent to the Mercantile Commerce Bank & Trust Company; and, therefore, Oscar is indebted to decedent in the aforementioned sum with interest at six percent from the dates of payment.

*Count 2:* Oscar owes decedent $25,000 with six percent interest from April 8, 1920, on a loan made by decedent to Oscar.

*Count 3:* Oscar owes decedent $1,992.88 with six percent interest from June 29, 1928, on a payment made by decedent to Arcadia Timber Company on Oscar's behalf.

*Count 4:* (1) Decedent made payments of $124,900 on a debt owed by the partnership to the estate of Sophie Franz for which decedent has not received credit on the partnership's books.

(2) Decedent paid a $70,000 indebtedness owed by Acreage Realty Company to Mercantile Commerce Bank & Trust

Company, and, consequently, because Acreage Realty is owned by the partnership, the latter is indebted to decedent in the aforementioned amount.

(3) Acreage Realty has paid off an indebtedness of $100,000 owed by it to Oscar, and, as a consequence, such payment should be reflected on the records of Acreage Realty, which are contained in the accounts of this company on the books of Buder & Buder.

(4) Oscar is indebted to the partnership in the amount of $80,707.06 on an open account.

(5) Oscar wrongfully took credit on the partnership's books for the amounts of $16,058.15 representing a payment by Oscar on behalf of the Arcadia Timber Company by reason of the fact that Oscar had previously been given credit for such payment.

(6) Oscar owes the partnership $26,041.66 representing partnership's funds used by Oscar for his own personal investments.

(7) Decedent is entitled to a credit on the partnership's books for $225,239.12 representing the proceeds from the sale of collateral put up by decedent on a partnership indebtedness, to be offset by a $75,000 disbursement made by the partnership to decedent which was not recorded on the partnership's books. Also, Oscar should account for $10,239.12 received by him from the creditor out of the proceeds from the sale of collateral put up by decedent to secure the loan.

(8) Decedent is the only party interested in the "Lydia D. Buder" account, which appears on the partnership's books, and is entitled to the balance of $47,471.50.

(9) and (14) Decedent is the only party interested in the "Burroughs Syndicate" account, which appears on the partnership's books, and is entitled to the balance therein, as corrected, of $62,456.57, as well as $50,000 which Acreage Realty owes to this account.

(10) The partnership is indebted to decedent by reason of a $5,000 loan made to Acreage Realty by Lydia D. Buder.

(11) Decedent's account in the partnership was improperly charged with the sum of $2,750, representing interest payments on a loan.

(12) Decedent is entitled to credit for payments of $11,761.74 made to the partnership on decedent's mistaken assumption that he owed interest on amounts borrowed by decedent from the partnership.

(13) Oscar should be charged on the partnership's books with $63,462.20 representing the debit balance in a partnership account entitled "Evens & Howard Sewer Pipe Company," resulting from personal transactions of Oscar.

(15) Oscar should be charged on the partnership's books with $1,157 representing a payment on his behalf by Acreage Realty to an insurance company.

Among the personal items this court finds that paragraphs 4, 5, 6, 7 (which have been abandoned), 8, 9, 10, 11, 14, 17 and 23 of the second amended petition, and Counts 1, 2 and 3 of the answer involve such items. This classification is as between personal and business.

Paragraph 10 of the second amended petition relates to a claim by Oscar for the return of 1,300 shares of Burrough's Adding Machine stock, with dividends thereon from December 4, 1933, which stock decedent had used as collateral for a loan. The record does not afford any explanation for the loan or show that the loan arose from anything other than a personal transaction.

Oscar asserts that he is the owner of 12,100 shares of the common stock of Arcadia Refining Company and one-half of that corporation's preferred stock, held by G. A. or his nominees. G. A. has denied the allegations and raised the defense that Oscar was guilty of laches because he failed to claim ownership to the stock or institute legal action prior to January 2, 1946. The Arcadia stock, according to Oscar's pleadings in the state court litigation, was acquired by the partnership as a consequence of loans made by the partnership to a predecessor

corporation. According to Oscar, the Arcadia stock was issued in straw names and is now held in the name of either G. A. or his nominees. Oscar here is asserting ownership to particular stock held in the names of G. A. or his nominees. G. A., by denying Oscar's allegations and raising the affirmative defense of laches, is defending or perfecting his title to the stock. It is true that the claim arose out of a business transaction, but still, title to property is being defended or perfected. Although the money came out of the Buder & Buder bank account, the transaction did not arise in connection with the taxpayers' profit-seeking activities. The transaction according to the credible testimony arose out of a loan and not an investment. Although the establishment of the rightful ownership of the Arcadia stock may be an integral part of unraveling the partnership's affairs, nevertheless, the claim pertains to an item separate from the other claims and relates specifically to the establishment of title to property.

As defendant points out, there are many items which fit only into this return-of-capital assets category. These without saying are items which did not arise in connection with the taxpayers' profit-seeking activities. These are paragraphs 8, 14 and 23 of the second amended petition and paragraphs 21 and 22 of the third amended petition and a $164,000 loan which is a part of the C. O. Moore Oil Company-Arcadia Refining Company matter.

The remaining personal items are not individually discussed as their classification is not controversial.

Under the recent decision of the Supreme Court in United States v. Gilmore, supra, 372 U.S. 1. c. 48, 83 S.Ct. 629, 9 L.Ed.2d 570, "* * * the characterization, as 'business' or 'personal,' of litigation costs of resisting a claim depends on whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities."

We must, therefore, determine what portion of the litigation expenses here involved was related to claims which did not arise in connection with the taxpayers' profit-seeking activities. There is no question that the legal services were rendered and the expenses were incurred and both were paid by the taxpayers, and no challenge has been raised as to their reasonableness, although there may well be a question as to their propriety, namely whether or not that portion allocated to business as opposed to personal expenses are both ordinary and necessary.

Taxpayers claim that those transactions or counts that have been denominated personal items, as opposed to business items, reflected on the partnership books, have become so intricately connected with the other affairs of the partnership so as to form an inseparable part of the accounting affairs. It has been pointed out that these items are not directly connected with the business of the partnership so as to form a base from which we could hold all the expenses incurred were ordinary and necessary business expenses. But another related question arises: If these personal and title items did not form the bases of claims in the state court litigation, would the deductible expenses under Section 162 include the expense of unraveling these items, clearly necessary to reveal the true nature of the directly connected business item-claims? Would that portion so attributable be an extraordinary and/or unnecessary expense?

But, that is not the question here. These expenses cannot all be attributed here to those items that are clearly directly connected with the business, since there are these personal and title claims before us, and the expenses of unraveling these claims are just as equally important to these claims as those directly connected with the business. In any event, the decisions indicate that if portions of expenses are attributable to items that are nondeductible, namely personal, they remain nondeductible even though the expenses may also be directed to a deductible item. Here we have the personal items forming the bases of claims in the state court litigation. See Gra-

vois Planing Mill Company v. C. I. R., 8 Cir., 299 F.2d 199, where, in reference to the Second Circuit's opinion in the Mills Estate, Inc., 206 F.2d 244 appeal, the Eighth Circuit and the Second Circuit reversed the Tax Court, 17 T.C. 910, to the extent it had allowed half of the legal fees and expenses as a deduction. The Tax Court, pursuant to Cohan v. Commissioner, 2 Cir., 39 F.2d 540, allocated half the legal fees and expenses to the recapitalization aspect of the transaction and half to the partial liquidation, and held the latter half deductible.

The Eighth Circuit, Gravois, supra, 299 F.2d l. c. 207, reversed the Tax Court, saying:

" * * * on the ground that all the corporate steps there taken were to be viewed 'as a single transaction'; that what occurred 'was essentially a reorganization'; that the legal services 'were all necessary steps to attain that end'; and that, as it was primarily a reorganization, the expenses were not deductible. The court observed that as a consequence it was not necessary in that case to decide whether the expense of what was a complete or partial liquidation for tax purposes was deductible as a business expense."

And at page 209 of 299 F.2d the court, after holding the dominant aspect was the partial liquidation and not the recapitalization, said: "We find nothing in this record to justify a conclusion that any part of these was for the benefit of Beckemeier personally."

Turning to the determination of an allocation of the expenses between the so-called personal and business items —personal being used in the broad sense of non-deductible expense, the evidence in this case does not permit an exact allocation of the expenses. Of course, exactness is not required, but there is conflict as to what is required before the court can allocate. Exemplifying one line of thought is Brinson·v. Tomlinson, 5 Cir., 264 F.2d 30. The parties there

agreed that a part of the legal work involved was business and gave rise to a deduction. The remainder of the work was recognized as giving rise to nondeductible fees. No allocation of the fees was put forth by the taxpayer. The court held that taxpayer had failed to meet his burden. of proof, namely the amount to which he was entitled. The court at page 33 of 264 F.2d cited Burnet v. Houston, 283 U.S. 223, 228, 51 S. Ct. 413, 75 L.Ed. 991. In that case the court said: "The impossibility of proving a material fact upon which the right to relief depends, simply leaves the claimant upon whom the burden rests with an unenforcible claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof."

The taxpayers have devoted a good part of their brief to some sort of an allocation. The defendant submits that the allocation is nothing more than speculation and that the testimony of Mr. Milligan, upon whose testimony the allocation is based, is not capable of supporting any allocation. The defendant's contention leads us right into the other line of thought as exemplified in Cohan v. Commissioner, supra. In that case, 39 F.2d l. c. 543 and 544, the Second Circuit said

"In the production of his plays Cohan was obliged to be free-handed in entertaining actors, employees, and, as he naively adds, dramatic critics. He had also to travel much, at times with his attorney. These expenses amounted to substantial sums, but he kept no account and probably could not have done so. At the trial before the Board he estimated that he had spent eleven thousand dollars in this fashion during the first six months of 1921, twenty-two thousand dollars, between July first, 1921, and June thirtieth, 1922, and as much for his following fiscal year, fifty-five thousand dollars in all. The Board refused to allow him any part of this, on the ground that it was im-

possible to tell how much he had in fact spent, in the absence of any items or details. The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent. True, we do not know how many trips Cohan made, nor how large his entertainments were; yet there was obviously some basis for computation, if necessary by drawing upon the Board's personal estimates of the minimum of such expenses. The amount may be trivial and unsatisfactory, but there was basis for some allowance, and it was wrong to refuse any, even though it were the traveling expenses of a single trip. It is not fatal that the result will inevitably be speculative; many important decisions must be such. We think that the Board was in error as to this and must reconsider the evidence."

■ The taxpayers' attempted allocation as set forth in the exhibits, briefs and evidence does not amount to mere speculation. Any attempted allocation of the expenses here involved would be a far cry from exactitude, but the taxpayers have attempted an allocation, and subject to modifications it will prevail. They in effect have carried their burden of proof albeit a close one, and we do not have to rely on Cohan for the allocation which will be set forth.

Plaintiffs attempt an allocation in their briefs, exhibits and evidence. The methods employed by the taxpayers for allocation do not, however, take into consideration all the issues here found to be personal. In taxpayers' Exhibit 1 prepared by Mr. Milligan, he sets out certain items which are here found to be personal items. According to Milligan's figures these personal items of taxpayers amount to $134,812.63. Similar items raised by the answer and counterclaims to the second amended petition were also taken into account in Exhibit 1 and are here found to constitute personal items. According to Milligan's figures these personal items amount to $149,557.48. Therefore, this makes a total of $284,370.11 in personal items. According to Milligan's figures, the total business items amount to $2,646,818.46. (Classifications as to business or personal are the court's.)

Exhibit 1 states the above figures indicate that the personal items (again using the court's classification) in the pleadings relating to the second amended petition are between nine and ten percent of the total amount involved. Milligan testified that in his opinion the amount of money involved in the claims and the number of pages of testimony taken before the referee in connection with the personal items (again using the court's classification) fairly reflected the amount of time devoted to these matters in proportion to the total time spent representing the taxpayers in the state court litigation, and it was his opinion that time spent and the value of the services was less than ten percent of the total time spent and the total value of his services. As pointed out in plaintiffs' brief, Exhibit 1 does not treat paragraph 14 of the second amended petition as a personal item, but it is here held to be personal. The plaintiffs' brief suggests that if this item is to be so treated, as the court holds, it would result in increasing the percentage of that category to a little over twelve percent of the total claims. It is to be noted that values were not assigned for paragraphs 5 and 6 of the second amended petition in Exhibit 1. Taxpayers' brief states that Milligan " * * * did not treat these as personal or capital items in dispute * * * because the ownership thereof * * * is admitted." (P. 15). However, it should be noted that these

paragraphs have been found by the court to be personal items and it certainly can't be said that there has been a showing that none of the expenses were directed to these items even though their ultimate disposition may be clear to the taxpayers.

Taxpayers contend that ten to twelve percent is actually too high and contend on page 16 of their brief that the plaintiffs are entitled to recover one-half in excess of nineteen million dollars. While Milligan convinced himself that the plaintiffs' recovery would be in the neighborhood of such a figure, the testimony here, the pleadings in the case in the state court, and the history of the action, would lead this court to the conclusion that such an opinion is not realistic.

Plaintiffs continue with a comparison of time spent on the personal items as opposed to the business items (see pages 9 and 10 of Exhibit 1). For the basis, they use the hearings before the referee and the numbers of pages of testimony. They estimate the personal items occupied less than eleven percent in 1953 and one percent in 1955, and say it is reasonable to infer the time spent was roughly in proportion to the amount of time devoted to these matters in hearings.

The general methods suggested by the taxpayers for allocation are reasonable. The court agrees with the taxpayers that such percentages still to be determined might well apply to such expenses as the payments to Feldman & Boyle for reporting the hearings before the referee, the cost of luncheons, and some of the minor expenses. We also agree with the taxpayers that the percentages are not applicable to the expenses of taking the depositions in New York, Florida and Detroit. We have previously dealt with that portion of the accounting expenses and the other expenses that could be used for a dual purpose.

Taxpayers all along have suggested that the expenses relating to the personal items were so small a portion of the total expenditures that the entire amount of the expenditures should be deductible. The evidence as a whole does not sustain this contention and it has been shown that the primary purpose rule is inapplicable to this entire case—that is, viewed as a whole.

Other issues are raised by the defendant concerning claims against G. A. Buder, Jr., Burroughs stock, and an amount in excess of four million dollars which G. A. Buder allegedly withdrew from the partnership bank account.

In light of the foregoing, and keeping in mind that a determination here can nowhere approach exactitude and that we have taken into account items not taken care of by taxpayers, it is the best estimate from the evidence in hand that for the years in question two-thirds of the expenses which taxpayers claim are deductible as business expenses under Section 162 and one-third of the expenses must be attributable to the personal non-deductible items category, as set forth in Gilmore, supra, including those categories we have so designated.

In determining the portion of the expenses applicable to defending or prosecuting personal issues, we have eliminated interest claims related to such personal issues on the theory that such interest, if recovered, would have constituted income to the taxpayers or would constitute income, the expense of collection of which would be deductible.

[13] The last remaining issue concerns whether or not the portion of expenses so allocated to business expenses are ordinary and necessary. We agree with the taxpayers' analysis of the Kornhauser case, supra, and the other cases cited by them, in respect that the business expenses here were both ordinary and necessary in their totality—that is, the two-thirds so allotted. Of course, we do not consider this question in regard to the other one-third.

In passing, we should note the question raised concerning the attorneys fees

as an expense. The memorandum of employment dated January 20, 1953, takes care of this issue. This memorandum refers to the state court litigation and reads (Tr. 127–28):

"This memorandum of employment of James J. Milligan as my attorney in the above case is to evidence the terms of his employment, to-wit: He is to receive twenty percent of the net recovery less any payments on account of fee advanced to him, whether by settlement or judgment. The payments made on account of such fee are to be retained in any event."

■ It is manifest that this employment arrangement is not a true contingent fee agreement. The twenty percent is the maximum fee Milligan can receive, but he is under no obligation to return any payments made on account of such fee. It is also stipulated that the plaintiffs paid the $1,540 fee on account during 1955. Some of it was paid during that year. We will allow it as a deduction even though we do not know for what work or when the fee was entailed. However, the allowable deduction will be only as to two-thirds thereof.

One last note: The defendant suggests that in all the cases cited by both sides, whether the deductions have been allowed or disallowed, the litigation which gave rise to the expenses sought to be deducted had been terminated. We are not certain that this is an issue in this case, as no authority was offered on either side, and maybe there is none, but in our opinion the state of flux in the state court proceeding simply adds emphasis to the fact that this case cannot be decided in exactitudes, but only on approximations, the bases of which the taxpayers have satisfied.

The court holds that two-thirds of the litigation expense in respect to Docket No. 93848–C paid by the taxpayers for the years 1955 and 1956 is properly deductible, and sustains the disallowance of the claimed deduction to the extent of one-third thereof.

This memorandum opinion is adopted by the court as its findings of fact and conclusions of law. Judgment will be prepared by the attorney for the plaintiffs and submitted to the court for entry.