## NEW JERSEY ET AL. v. NEW YORK, SUSQUEHANNA & WESTERN RAILROAD CO.

No. 104.   Argued December 11, 1962.—Decided February 18, 1963.

*William Gural,* Deputy Attorney General of New Jersey, argued the cause for appellants.   With him on the briefs was *Arthur J. Sills,* Attorney General.

*Vincent P. Biunno* argued the cause for appellee.   With him on the brief was *Charles H. Hoens, Jr.*

1

2

*Solicitor General Cox, Assistant Attorney General Loev-inger, Robert B. Hummel, Irwin A. Seibel, Robert W. Ginnane* and *H. Neil Garson* filed a brief for the United States and the Interstate Commerce Commission, urging reversal.

Briefs of *amici curiae,* urging reversal, were filed by *Clarence M. Mulholland, Edward J. Hickey, Jr.* and *James L. Highsaw, Jr.* for Railway Labor Executives' Association, and by *Austin L. Roberts, Jr.* for National Association of Railroad and Utilities Commissioners.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This direct appeal from a three-judge District Court involves the jurisdiction of the Interstate Commerce Commission to permit discontinuance of trains operated by the appellee railroad wholly within the State of New Jersey. At issue is whether the discontinuance procedures of § 13a (1) or § 13a (2) of the Interstate Commerce Act (72 Stat. 571–572, 49 U. S. C. §§ 13a (1), 13a (2)) are to be followed.

Appellee, New York, Susquehanna & Western Railroad Co., operates passenger trains between Butler, New Jersey, and Susquehanna Transfer, in North Bergen, New Jersey. Connecting buses, carrying only train passengers, run between North Bergen and the Port of New York Authority Bus Terminal in Manhattan. The buses are owned and operated by Public Service Coordinated Transport, a New Jersey corporation unaffiliated but under contract with appellee. According to appellee, nearly 90% of its passengers travel to and from New York.

As recently as 1956, appellee operated 30 passenger trains eastbound and 30 westbound on weekdays and 17 or 18 in each direction on weekends. Because of financial difficulties and continued losses on passenger train

operations, appellee has, with the permission of the Public Utilities Commission of New Jersey, reduced the number of trains from time to time so that it now operates only three trains in each direction on weekdays and none on weekends. The last reduction was authorized on July 14, 1960.

On December 30, 1960, appellee filed a notice with the Interstate Commerce Commission stating that it would discontinue all passenger train service on January 30, 1961. On January 9, 1961, appellants petitioned the Interstate Commerce Commission to dismiss the case without prejudice. Since appellee operated trains solely in New Jersey, appellants argued that the case was not, in the first instance, within the jurisdiction of the Commission. The Commission agreed and, on January 18, dismissed the notice for want of jurisdiction. Appellee then brought this suit in the United States District Court for the District of New Jersey to challenge the dismissal. A three-judge court was designated in accordance with 28 U. S. C. §§ 2321–2325 and 2284. The court, one judge dissenting, set aside the Commission's order. 200 F. Supp. 860. New Jersey appealed directly to this Court under 28 U. S. C. § 1253, and we noted probable jurisdiction. 370 U. S. 933.

The question presented is whether the procedure for discontinuing trains set forth in § 13a (1) of the Interstate Commerce Act is available to the appellee railroad as the court below held, or whether it must follow that set forth in § 13a (2) of the Act. Section 13a (1) relates to "the discontinuance . . . of the operation or service of any train or ferry operating from a point in one State to a point in any other State." A railroad proceeding under this section must first file notices of the proposed discontinuance with the Interstate Commerce Commission, with the Governors of the States in which the train operates, and in every station served by the train. After

4

30 days, the railroad may discontinue the train unless the Commission has decided to investigate the discontinuance. The Commission may require the railroad to continue operations, pending its investigation, for an additional four months. It also may, at the conclusion of the investigation, order service continued for another year, if it is "required by public convenience and necessity" and if it "will not unduly burden interstate . . . commerce."

Section 13a (2) governs "the discontinuance . . . of the operation or service of any train or ferry operated wholly within the boundaries of a single State." Under this section, the railroad is first required to seek relief from the appropriate state agency. Only after the state agency has denied the application of discontinuance, or has let 120 days elapse from the time the application was filed without acting, can the railroad seek authority from the Interstate Commerce Commission to discontinue the train. The Commission "may grant such authority only after full hearing."

A comparison of the language of § 13a (1), which applies to "any train . . . *operating from a point in one State to a point in any other State*" (italics supplied), and of § 13a (2), which applies to "any train . . . *operated wholly within the boundaries of a single State*" (italics supplied), makes it clear that the statute, on its face, requires appellee to proceed under the latter section. Appellee's trains do not run "from a point in one State to a point in any other State." That appellee's passengers, by other conveyances, cross a state line does not alter the conclusion; the statute speaks not of interstate commerce but of the physical limits of a train's or ferry's operations.[1]

---

[1] Apparently one ground for the decision below was the belief (1) that "operation or service" of a train included bus service or (2) that "train" included a bus extension. As to the first, it should be noted that the Interstate Commerce Commission has decided, in

Any doubt about this construction of the statute is dispelled by an examination of its legislative history. Section 13a was enacted by Congress as part of the Transportation Act of 1958. The legislative history of that Act reveals Congress' concern about the financial plight of railroads, attributable in part to the losses sustained in operating passenger trains. To discontinue these trains before the enactment of § 13a, the railroads were required in all cases to seek authority from each of the States served. See 104 Cong. Rec. 10842–10843, 10851. Without concurrence of all the States affected, the railroad might be compelled to continue operations despite serious losses. The Interstate Commerce Commission was able to give only partial relief. It could authorize the total abandonment of a line of railroad under § 1 (18) of the Act, even if the line was wholly within the boundaries of one State. *Colorado* v. *United States*, 271 U. S. 153. However the Commission could not permit partial discontinuance of service over a line of railroad, whether the line crossed state boundaries or not. *Board of Public Utility Comm'rs of New Jersey* v. *United States*, 158 F. Supp. 98, probable jurisdiction noted, 357 U. S. 917, dismissed as moot, 359 U. S. 982.[2]

interpreting § 1 (18) of the Act, that appellee's bus service to New York is not part of a "line of railroad" and that appellee need not obtain a certificate of public convenience and necessity before providing the bus transportation. *New York, S. & W. R. Co. Common Carrier Application,* 46 M. C. C. 713, 725. Admittedly "line of railroad" is a different term from "operation or service of any train." However we should be loath to suggest that a train could operate where no line of railroad existed.

As to the second alternative, it is answer enough to note that the statute reads "any train or ferry." No mention of "bus" is made.

[2] The railroads appealing to this Court did not take issue with the Interstate Commerce Commission decisions holding that the Commission lacked power to authorize partial discontinuances. They argued that instead of partially discontinuing service they were abandoning a line of railroad.

See *Palmer* v. *Massachusetts,* 308 U. S. 79, 84–85. Thus the Commission could not permit discontinuance of passenger operations while the railroad continued to carry freight over the same line.[3]

As initially proposed in the Senate, the Interstate Commerce Commission would have had power under § 13a to permit discontinuance "of the operation or service of any train or ferry engaged in the transportation of passengers or property in interstate, foreign and intrastate commerce . . . or of the operation or service of any station, depot or other facility." S. 3778, 85th Cong., 2d Sess. Opposition to the bill focused upon the reduction of state powers to control local train operations. *E. g.,* 104 Cong. Rec. 10850. A compromise amendment in the Senate changed § 13a so that the Commission's power would extend only to "any train or ferry engaged in the transportation of passengers or property in interstate or foreign commerce." 104 Cong. Rec. 10862–10866. Reference to intrastate transportation was eliminated. And as finally reported out of conference, the Act was in its present form. The Interstate Commerce Commission's jurisdiction was limited, in the first instance, to the "discontinuance . . . of the operation or service of any train

---

[3] In the *Board of Public Utility Comm'rs of New Jersey* case the three-judge District Court held that the Interstate Commerce Commission could not allow the New York Central Railroad to discontinue its passenger ferries across the Hudson River, while continuing to operate ferries for freight, if the ferries were all part of the same line of railroad. (Under § 1 (3) of the Act, the term "railroad" includes "ferries used by or operated in connection with any railroad.") After Congress passed § 13a, the New York Central Railroad, among others, succeeded in eliminating its Hudson River passenger ferries. See *New Jersey* v. *United States,* 168 F. Supp. 324, aff'd *per curiam,* 359 U. S. 27. In fact, the New York Central Railroad claimed that its inability to discontinue the passenger ferries was the reason Congress enacted § 13a. 168 F. Supp., at 337, n. 1.

or ferry operating from a point in one State to a point in any other State."

Senator Smathers, the Chairman of the Surface Transportation Subcommittee of the Senate Interstate and Foreign Commerce Committee, said, in describing the Senate compromise amendment, that:

> "any train which operates within a State, whose origin and destination are within the State—that is, any train with intrastate characteristics—together with the facilities used by the train, shall be completely under the authority of the State public utilities commission." 104 Cong. Rec. 10852.[4]

Congressman Harris, Chairman of the House Interstate and Foreign Commerce Committee, similarly interpreted the more restrictive House version, H. R. 12832.[5] He said the Interstate Commerce Commission was limited to authorizing the discontinuance

> "of a train or ferry on a line of railroad not located wholly within a single State. This limitation is contained in the bill being reported because the

---

[4] Apparently those who were concerned with the protection of the rights of the States were not satisfied with the compromise amendment, perhaps because it retained the phrase "engaged in the transportation of passengers or property in interstate . . . commerce." In any event, they were successful in obtaining the omission of any reference to transportation in interstate commerce, since the Act as passed limited Interstate Commerce Commission jurisdiction, in the first instance, to the discontinuance of "any train . . . operating from a point in one State to a point in any other State."

[5] H. R. 12832 provided that: "this section [§ 13a] shall not apply to the operations of or services performed by any carrier by railroad on a line of railroad located wholly within a single State." 104 Cong. Rec. 12547. Also, the House bill eliminated the Interstate Commerce Commission's jurisdiction over discontinuance of stations, depots and other facilities, leaving the state regulatory agencies' power untouched. This change, embodied in the Act, is additional evidence of Congress' intent to leave regulation of local operations to the States.

committee feels that the record at this time does not support the broader change in venue, requested by the railroads, which would have covered Interstate Commerce Commission jurisdiction also over operations more local in character, such as those of a branch line or other line of railroad located solely within one State." 104 Cong. Rec. 12533.

Congressman Harris repeatedly stated that even if the train in question operated on an interstate line, the state regulatory agency would have jurisdiction if the train started and ended within the State. 104 Cong. Rec. 12530, 12542.

Finally, Senator Smathers' comments, made after the Senate-House Conference changed the bill to its present form, should be noted. He said:

"we protected the right of the States . . . by leaving to the State regulatory agencies the right to regulate and have a final decision with respect to the discontinuance of train service which originated and ended within one particular State, except when it could be established that intrastate service was a burden on interstate commerce.

"In addition, the Senate receded on a provision under which we had given the Interstate Commerce Commission jurisdiction also to discontinue service in depots, terminals, and other such facilities in connection with the operation of railroads. We left that matter in the hands of the State regulatory agencies." 104 Cong. Rec. 15528.

It is clear to us from this history, as it was to the Commission, that Congress intended to, and did, leave "[j]urisdiction over trains operating wholly within a single State . . . with State regulatory commissions."

The court below disregarded the plain words of the statute and what we believe is the pertinent legislative

history and rested its decision on the ground that to apply § 13a (1) so restrictively would "thwart the apparent purpose of the Congress in adopting it." 200 F. Supp., at 864. That purpose was, as the court below observed, remedial. But it was conditioned by a desire to protect state jurisdiction over local operations. To ignore this we conclude was error. Therefore the judgment of the court below must be

*Reversed.*