The **PENNSYLVANIA RAILROAD COMPANY**, Appellee,

v.

Joseph **SHARFSIN**, P. Stephen Stahlnecker, Robert W. Anthony, William F. O'Hara and John L. Dorris, Individually and as Commissioners of the Pennsylvania Public Utility Commission, Appellants.

No. 15855.

United States Court of Appeals
Third Circuit.

Argued Oct. 4, 1966.

Decided Dec. 6, 1966.

William A. Goichman, Philadelphia, Pa. (Edward Munce, Asst. Counsel, Joseph C. Bruno, Chief Counsel, Harrisburg, Pa., on the brief), for appellants.

Charles E. Mechem, Asst. General Sol., Pennsylvania Railroad Co., Legal Department, Philadelphia, Pa., for appellee.

Before FORMAN, FREEDMAN and SEITZ, Circuit Judges.

### OPINION OF THE COURT

SEITZ, Circuit Judge.

This appeal by the Pennsylvania Public Utility Commission ("P. U. C.") challenges an injunction issued by the District Court at the behest of the Pennsylvania Railroad ("Railroad") against enforcement of a P. U. C. order commanding the Railroad to restore certain train service within Pennsylvania.

In November 1960, the Railroad applied to the P. U. C. for authority to discontinue service at stations within Pennsylvania of two passenger trains which operated during the night between Harrisburg, Pennsylvania and Hagerstown, Maryland.[1] On August 7, 1961, the P. U. C. denied the application. Although there is an appeal provision, the Railroad did not appeal the decision. Rather, on January 24, 1962, the Railroad filed with the Interstate Commerce Commission a notice with supporting data of a proposed discontinuance of the trains effective February 25, 1962. This was done pursuant to Section 13a(1) of the Interstate Commerce Act (49 U.S.C. § 13a(1)).[2] The Railroad concededly

---

1. No Maryland application was filed because these trains did not provide intrastate service therein and thus the trains were not within the regulatory concern of that state, at least for present purposes.

2. Section 13a(1) provides:

   "A carrier or carriers subject to this chapter, if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State or in the District of Columbia, or from a point in the District of Columbia to a point in any State, are subject to any provision of the constitution or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding. Upon the filing of such notice the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change. Upon the institution of such investigation, the Commission, by orders served upon the carrier or carriers affected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation, whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration

complied with the requirements of that Act and pertinent regulations. The P. U. C. received notice and on February 8, 1962 served by mail a petition to intervene. A few other protests were also filed.

On February 8, 1962, the I. C. C. in a notice with a service date of February 12, 1962 reached its conclusion not to institute a formal investigation of the proposed discontinuance.[3]

On February 20, 1962—five days before the trains were to be discontinued—the P. U. C. served upon the Railroad a Rule to Show Cause why it should not be required to continue the operation of the trains in question within the State of Pennsylvania. By way of answer to the Rule the Railroad referred to its proceeding under the Interstate Commerce Act and argued that jurisdiction over the discontinuance of the trains had thereby become subject to the exclusive jurisdiction of the I. C. C. The Railroad discontinued the trains on February 25.

After the hearing on the Rule the P. U. C. on July 9, 1962 reaffirmed its order of August 7, 1961 and directed the Railroad to restore the particular trains. The P. U. C. decision was apparently not based on the grounds advanced by the parties but was bottomed on the unconstitutionality of Section 13a(1) of the Interstate Commerce Act, as here applied, under the Commerce and Due Process clauses of the Federal Constitution.

The Railroad also did not appeal this P. U. C. decision. Instead, it commenced the present action to enjoin the P. U. C. from enforcing its 1962 order. The District Court, with jurisdiction based upon 28 U.S.C.A. § 1337, on February 9, 1966 enjoined the P. U. C. from instituting proceedings concerning the Railroad's action in discontinuing the trains in question. See Pennsylvania Railroad Company v. Sharfsin, 240 F.Supp. 233 (M.D.Pa.1965), an opinion by a three-judge District Court readopted verbatim after the Supreme Court had vacated the judgment on the ground that a three-judge court was not required and that appeal should be to this court. See also Sludden v. United States, 211 F.Supp. 150 (M.D.Pa.1962). This is the decision on the P. U. C.'s appeal from the trial court's judgment.

The P. U. C. first contends on various grounds that § 13a(1) is unconstitutional as applied to this case. Stripped to its bare bones the P. U. C.'s argument is that Congress cannot under the commerce clause empower the discontinuance of trains insofar as they may operate between station points within a single state, even though they are an integral part of an interstate trip, unless there is a finding that their intrastate movements constitute an undue burden on or interference with interstate commerce.

█ We first consider whether § 13a(1) requires the procedure and showing which the P. U. C. says is required as a prerequisite to control of the operation

---

of operation or service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order. The provisions of this paragraph shall not supersede the laws of any State or the orders or regulations of any administrative or regulatory body of any State applicable to such discontinuance or change unless notice as in this paragraph provided is filed with the Commission. On the expiration of an order by the Commission after such investigation requiring the continuance or restoration of operation or service, the jurisdiction of any State as to such discontinuance or change shall no longer be superseded unless the

procedure provided by this paragraph shall again be invoked by the carrier or carriers."

3. The I. C. C. took this action before the expiration of the time fixed in the Railroad's notice for the filing of objections and obviously before it had received the P. U. C.'s petition. It was, to say the least, a most inappropriate procedure for the I. C. C. to follow. However, the P. U. C. does not argue that this method of handling the matter vitiated the decision, possibly because the I. C. C. still had time to change its decision had it so desired after the petition to intervene was received.

of these trains within Pennsylvania. This section clearly does not by its terms require the showing of undue burden which the P. U. C. claims is mandatory to bind the state here. Indeed, when a(1) is compared with a(2), adopted at the same time, it is evident that Congress did not intend to require such a showing under a(1). In contrast, a(2) which embraces "any train or ferry operated wholly within the boundaries of a single state" specifically requires, inter alia, as a prerequisite to relief thereunder, a finding after an adversary type of hearing that the continued operation or service of the train or ferry without discontinuance or change in whole or in part would constitute an unjust and undue burden upon the interstate operations of the carrier. It would thus fly in the face of the evident Congressional intent to construe a(1) to require the I. C. C. to grant in this case a hearing at which the issues of undue burden on or interference with interstate commerce would be tried by the I. C. C. in a full adversary proceeding. We do not so construe it.

■ We are therefore required to examine the P. U. C. contention that Congress under § 13a(1) cannot constitutionally authorize discontinuances of intrastate train operations (two or more stops within a state) which are a part of an interstate train service without itself finding or providing for a finding that the intrastate operations are a burden on or interference with interstate commerce.

We commence from the established and governing law announced in State of New Jersey v. United States, 168 F. Supp. 324, (D.C.N.J.1958), aff'd., 359 U.S. 27, 79 S.Ct. 607, 3 L.Ed.2d 625, (1959). That case involved a ferry which operated between New Jersey and New York to service trains on the West Shore Line of the New York Central Railroad. The United States Supreme Court affirmed the district court decision holding, inter alia, that the procedure incorporated in § 13a(1) was constitutional, at least on the facts there

involved. The P. U. C. says the case is distinguishable because it involved a ferry which operated only in interstate commerce whereas in our case the trains operated in both interstate and intrastate commerce. While we think the force of New Jersey v. U. S. is greater than counsel for the P. U. C. would concede, it is certainly true that the factual distinction suggested by the P. U. C. does exist between the New Jersey case and ours. The question here is whether that distinction makes the difference.

The P. U. C.'s counsel contends that a fair reading of certain United States Supreme Court cases reveals a limitation on Congress' power under the commerce clause when it is exercised so as to affect intrastate commerce. It says that in such situations the Congress must either itself find that the particular intrastate activity is an undue burden upon or interference with interstate commerce or provide for such a finding after a full hearing. We do not understand that the Railroad quarrels with this contention. Rather, it says that we are concerned solely with the application of congressional power over interstate commerce. The resolution of this conflict commences with an analysis of the legislation involved.

At the risk of repetition, it is important to understand the statutory scheme involved in § 13a(1) and (2). Section 13a(1) deals with trains and ferries "[O]perating from a point in one State to a point in any other state * * * ". In contrast (2) embraces trains and ferries which are "operated wholly within the boundaries of a single state * * ". As is noted in the House Report on this legislation, § 13a(1) gives the railroads an option to "have the Interstate Commerce Commission, rather than State commissions, pass upon the discontinuance or change in the operation or service of any train or ferry. This option is limited, however, to the operation or service of a train or ferry on a line of railroad not located wholly within a single state." 2 U.S.Code Cong. & Legisl. News p. 3468 (1958). Section 13a(2),

on the other hand, deals with purely intrastate operations. It protects the rights of the states "by leaving to the state regulatory agencies the right to regulate and have a final decision with respect to the discontinuance of train service which originated and ended within one particular state, except when it could be established that intrastate service was a burden on interstate commerce." 104 Cong.Rec. 15528. See also Southern R. Co. v. North Carolina, 376 U.S. 93, 84 S.Ct. 564, 11 L.Ed.2d 541 (1964); and State of New Jersey v. New York, S. & W. R. Co., 372 U.S. 1, 83 S.Ct. 614, 9 L.Ed.2d 541 (1962).

Reading § 13a(1) and (2) together with their legislative history makes it clear that under a(1) Congress was legislating with respect to all interstate train service. Thus, even the P. U. C. would presumably agree that by following the procedure outlined in a(1) the Railroad was entitled to discontinue the interstate service of the trains in question. But the P. U. C. says in effect that such an order could not affect the so-called intrastate aspect of their service without a finding in an adversary proceeding that the continuation of such service would be a burden upon or interference with interstate commerce.

Can it be said that an interstate train which serves more than one point within any state has an intrastate function which the Congress can regulate at the same time only by showing that it constitutes a burden upon or interference with interstate commerce? We think the answer to this question is found from an evaluation of the purpose of a particular interstate regulation when considered with the nature of the subject matter involved.

We think it is an unwarranted construction of the Commerce Clause to say that Congress may authorize the I. C. C. to permit without a hearing the discontinuance of trains which operate between states but may not authorize the I. C. C. to allow the discontinuance of the very same trains insofar as they operate wholly within those states except upon a finding, after hearing, that the intrastate operation is a burden upon or interference with interstate commerce. We are satisfied that the mere fact that a train operating in interstate commerce makes more than one stop within a single state does not alter the interstate character of its operation so as to limit the power of Congress to legislate fully with respect thereto.

We reach these conclusions because effective regulation in this area of interstate commerce would be substantially frustrated if each state retained authority over the so-called intrastate portions of the operation after termination of interstate service.[4] This conclusion is evident from a consideration of the practicality of the situation. We take notice that many interstate trains pass through several states, making more than one stop within each state. Under the P. U. C.'s view § 13a(1) would be largely meaningless as applied to the so-called intrastate segments because after permission was obtained under § 13a(1), the carrier would then have to apply to each such state or, if refused, proceed under § 13a(2). Certainly a(1) of the statute was not intended to so operate and we do not believe it is unconstitutional because it permits regulation of all interstate train service, including service between points within a state, without a finding of burden upon or interference with interstate commerce.

We think the case law amply supports the conclusion that the fact of service between points within a state of an interstate train does not limit congressional power to deal with the so-called intrastate aspects to cases where proof of burden on or interference with interstate commerce can be shown. Rather, we think that no state power

4. Indeed, the P. U. C. would presumably contend that the limitation for which it contends would be applicable to any change in the operation of these trains between stops within Pennsylvania.

to order the continuance of these trains within Pennsylvania survived the proper invocation of § 13a(1) by the Railroad.

As the Supreme Court said in State of Colorado v. United States, 271 U.S. 153, 165–166, 46 S.Ct. 452, 455, 70 L.Ed. 878 (1926):

"Because the same instrumentality serves both [interstate and intrastate commerce], Congress has power to assume not only some control but paramount control insofar as interstate commerce is involved. It may determine to what extent and in what manner intrastate service must be subordinated in order that interstate service may be adequately rendered. The power to make the determination inheres in the United States as an incident of its power over interstate commerce. The making of this determination involves an exercise of judgment upon the facts of the particular case. The authority to find the facts and to exercise thereon the judgment whether abandonment is consistent with public convenience and necessity, Congress conferred upon the Commission."

It was also contended by the State in the Colorado case "that the order [of the I. C. C.] is void, so far as it relates to intrastate traffic, because essential findings were not made * * *". One finding alleged to be essential and lacking was that "by continued operation of the branch interstate or foreign commerce will be discriminated against, * * *". Later in the opinion the court gave its answer:

"While the constitutional basis of authority to issue the certificate of abandonment is the power of Congress to regulate interstate commerce, the Act does not make issuance of the certificate conditional upon a finding that continued operation will result in discrimination against interstate commerce, or that it will result in a denial of just compensation for the use in intrastate commerce of the property of the carrier within the state, or that it will result in a denial of such compensation for the property within the state used in commerce intrastate and interstate. The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce."

The P. U. C. says our case calls for an answer to a question suggested but avoided in State of Texas v. Eastern Texas R. R. Co., 258 U.S. 204, 42 S.Ct. 281, 66 L.Ed. 566 (1922). In that case the railroad involved owned a line which, while apparently connecting with lines in other states, was located entirely within one state. It carried both interstate and intrastate commerce. The I. C. C. granted the railroad authority to abandon and cease operating the road. The state claimed that the I. C. C. did not have the power to authorize an abandonment of the intrastate operations.

The United States Supreme Court decided that the Congress had the power to act through the I. C. C. to authorize a termination of the interstate traffic on the railroad. The court then said that if certain paragraphs of the act of Congress were to be construed as authorizing the Commission to deal with the abandonment of such a road as to intrastate as well as interstate and foreign commerce, "a serious question of their constitutional validity will be unavoidable". It is this point which the P. U. C. argues most earnestly must now be decided. However, we do not believe the question is presented here, as reference to the language of the opinion will show. The court there said:

"The road lies entirely within a single state, is owned and operated by a corporation of that state, and is not a part of another line. Its continued operation solely in intrastate commerce cannot be of more than local concern. Interstate and foreign commerce will not be burdened or affected by any shortage in the earnings nor will any carrier in such commerce have to bear or make good the shortage. It is not as if the road were a branch or exten-

sion whose unremunerative operation would or might burden or cripple the main line and thereby affect its utility or service as an artery of interstate and foreign commerce."

Again in the same opinion it is said:

" * * * As a whole these acts show that what is intended is to regulate interstate and foreign commerce and to affect intrastate commerce only as that may be incidental to the effective regulation and protection of commerce of the other class. They contain many manifestations of a continuing purpose to refrain from any regulation of intrastate commerce, save such as is involved in the rightful exertion of the power of Congress over interstate and foreign commerce."

Here, the fact aside that the Railroad's lines do not lie entirely within Pennsylvania, the important circumstance is that the very trains in question operated across state lines. Nor is it permissible here to "convert" these trains into intrastate trains by viewing them apart from and after termination of their interstate operation. We do not believe that such a fragmenting approach is legally or practically permissible. When it adopted § 13a(1) Congress preempted the field in the area involved under its interstate commerce power and a finding of a reserved power in this area in the states is incompatible therewith. We conclude that § 13a(1) as construed represents a constitutional exercise of power by Congress under the Commerce Clause.

■ The P. U. C. next argues that § 13a(1), in permitting supercession of a state order to take place whenever a railroad files a notice of discontinuance, is an unlawful delegation of legislative power to a private person.

The short answer to this contention is that there is no delegation to a private

person. The Congress itself determined that a self-implementing procedure would be established. State of New Jersey v. United States, 168 F.Supp. 324 (D.C. N.J.1958); aff'd., per curiam 359 U.S. 27, 79 S.Ct. 607, 3 L.Ed.2d 625 (1959). But let us look beyond that answer. It is true that the railroad files the notice under a(1), but even that is not the end of the matter. Under a(1) the I. C. C. must decide whether it believes an investigation is warranted. See State of New Jersey v. United States, above.

■ The P. U. C. also contends that § 13a(1) as applied in this case violates the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

Counsel for the P. U. C. concedes that there is no direct authority to support its position. Nevertheless we look to the merits of the contention. Actually, the P. U. C. is saying that Congress should have made provision for the States affected to present their case at a·hearing. The prime answer is found in State of New Jersey v. United States, supra, where the Due Process argument was rejected. Since Congress had plenary power over interstate commerce it alone was the judge of the appropriate procedure to be incorporated in a(1).[5] We are not concerned with any taking of property or invasion of any other constitutionally protected right.

■ The P. U. C. next contends that the Administrative Order of the P. U. C. is a "record" or "judicial proceeding" within the Full Faith and Credit Clause and should have been accorded the same respect as it receives by the state. Apart from anything else, we think that when the Railroad submitted this matter to the I. C. C. under § 13a(1) on January 24, 1962, the P. U. C. was without further jurisdiction of the particular subject matter. This conclusion follows from the

---

5. We should note that the Railroad submitted to the I. C. C. with its notice of intent to discontinue these trains a rather elaborate statement of the passenger use, revenues, etc. of these trains and referred to the proceedings before the P. U. C. While the P. U. C. challenges the accuracy of some of the statements, it has not called upon us to decide in this proceeding whether the I. C. C. had a sufficient basis for exercising its discretion not to investigate.

language of § 13a(1). Thus, the P. U. C.'s order of July 9, 1962, was not entitled to Full Faith and Credit.

■ Finally, the P. U. C. says the district court should have declined to exercise jurisdiction on the basis of the doctrine of comity. Courts generally should be most conscious of the need to avoid unnecessary encroachment on pending proceedings in other forums. However, it is evident that the application of the comity doctrine here would fly directly into the face of the Congressional intent as expressed in § 13a(1). For that section is, by its terms, to be applicable even though the railroad involved is subject to any state "order" or has "any proceeding pending" before a state agency. Combining the exclusive nature of the power supporting the enactment of § 13a (1) with the intent there manifested, we think it would at best be inappropriate to apply the comity doctrine in favor of the State Commission's order.

The judgment of the district court will be affirmed.