**CITY OF CHICAGO, Maurice F. Radrizzi, Thomas J. Duggan and Gordon E. Cox, Plaintiffs,**

**Nebraska State Railway Commission and Colorado Public Utilities Commission, Intervening Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission, the Western Pacific Railroad Company, the Denver and Rio Grande Western Railroad Company and Southern Pacific Company, Defendants.**

**CITY OF CHICAGO, Nebraska State Railway Commission, Colorado Public Utilities Commission, Maurice F. Radrizzi, Thomas J. Duggan and Gordon E. Cox, Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission and Burlington Northern, Inc., Defendants.**

**Nos. 70 C 585, 70 C 689.**

United States District Court, N. D. Illinois, E. D.

June 4, 1970.

Rehearing Denied June 29, 1970.

887

Richard L. Curry, Raymond Simon, Corp. Counsel, Chicago, Ill., Keith E. Roberts, Wheaton, Ill., Gordon P. Mac-Dougall, Washington, D. C., C. C. Sheldon, Asst. Atty. Gen., State of Nebraska, Lincoln, Neb., John E. Archibold, Asst. Atty. Gen., State of Colorado, Denver, Colo., for plaintiffs.

Thomas A. Foran, U. S. Atty., for the United States.

Howard J. Trienens, Chicago, Ill., for Southern Pacific.

Belnap, McCarthy, Spencer & Hardy, Chicago, Ill., Nahun Litt, Washington, D. C., for Western Pacific.

Arthur J. Cerra, I.C.C., Washington, D. C., for I.C.C.

R. T. Cubbage, R. M. Gleason, Chicago, Ill., for Burlington Northern.

Before KERNER, Circuit Judge, and PARSONS and WILL, District Judges.

PER CURIAM.

The plaintiffs seek to enjoin under 28 U.S.C. § 2325 various orders of the Interstate Commerce Commission permitting the discontinuance of certain passenger trains of the Western Pacific Railroad and a reduction of passenger service by the Denver and Rio Grande Western, Southern Pacific and the Burlington Northern Railroads.

On May 12, 1969, the Denver and Rio Grande Western sent notices to the I.C.C. and the Governors of Colorado and Utah proposing discontinuance of passenger trains numbers 17 and 18, the California Zephyr, between Denver, Colorado, and Salt Lake City, Utah, as of June 16, 1969. Notices were also posted in the cars and the stations along the route. The I.C.C. entered into an investigation and postponed the discontinuance for a period not to exceed four months as provided by statute. Hearings were held from July 14 to 31, 1969, in various places in Colorado and Utah.

The Western Pacific Railroad on July 23, 1969, notified the I.C.C. and the Governors of the states of California, Nevada and Utah of its proposal to discontinue its operation of the Zephyr between Salt Lake City, Utah, and San Francisco, California, as of September 5, 1969. The Southern Pacific Company on July 29, 1969, filed notices with the I.C.C. and the Governors of California, Nevada and Utah proposing that its train service between Ogden, Utah, and San Francisco which runs parallel to the route of the Zephyr be reduced to thrice-weekly from daily as of September 1, 1969. Both the Western Pacific and the Southern Pacific posted notices in cars and stations along the route. On August 20, 1969, the Commission entered into an investigation of both proposals and continued operation for the four-month period. Hearings were held from October 6, to November 1, 1969, on a consolidated record.

No notices were ever served on the Governors of the states through which the Zephyr runs between Denver, Colorado, and Chicago, Illinois, and notices were not posted in the stations along the route. On the Southern Pacific route, no notices were posted east of Ogden, Utah, although the train was operated by the Union Pacific Railroad from Ogden, Utah, to Omaha, Nebraska, and by the Chicago, Milwaukee & St. Paul Railroad Company from Omaha to Chicago.

Petitions to dismiss for failure to notify the Governors of the states along the entire route and petitions by these states to intervene in the proceedings were denied by the I.C.C.

On February 11, 1970, the I.C.C. entered a report on all three proposals.* The Western Pacific was permitted to discontinue its segment of the Zephyr effective March 13, 1970. The Denver and Rio Grande Western's proposal to discontinue was rejected and instead, thrice weekly service was substituted. The Southern Pacific's proposal for thrice weekly service was accepted with the condition that the Southern Pacific and the Denver and Rio Grande Western arrange for an interchange of passengers either at Salt Lake City or Ogden, Utah. The thrice weekly operation was to commence at the end of thirty days, but not until an interchange agreement was reached, and was to last until October 15, 1970.

---

* The defendant railroads had previously entered into an agreement to waive the four-month statutory period.

On February 19, 1970, the Western Pacific filed a new notice proposing complete discontinuance and the Commission did not exercise its discretion to investigate. New Jersey v. United States, 168 F.Supp. 324 (D.N.J.1958), affirmed, 359 U.S. 27, 79 S.Ct. 603, 3 L. Ed.2d 625 (1959).

On February 27, 1970, the Burlington Northern filed notices with the I.C.C. and the Governors of all the states between Denver, Colorado, and Chicago, Illinois, proposing a reduction in California Zephyr service from daily to thrice weekly. The Commission entered into an investigation on March 18, 1970, and ordered continuation of Zephyr service for the statutory four-month period. On March 20, 1970, the Commission modified its order of March 18 and allowed the Burlington to discontinue its former Zephyr service between Chicago and Denver on the condition that it establish a new tri-weekly train between Omaha and Denver which would connect with the Burlington's present daily service to Omaha and the Denver and Rio Grande Western's thrice weekly service west of Denver.

Plaintiffs filed suit against the Western Pacific Railroad, Denver and Rio Grande Western Railroad and the Southern Pacific Railroad in the district court on March 12, 1970, requesting a temporary restraining order and the appointment of a three-judge court pursuant to 28 U.S.C. § 2325. The district court granted the restraining order and convened a three-judge court. This court was convened on March 20, 1970, and at that time a request for a preliminary injunction to prevent the Western Pacific from discontinuing its service and the Denver and Rio Grande Western and the Southern Pacific from reducing their service to thrice weekly during the pendency of the proceedings in the court was presented. The injunction was denied.

On March 23, 1970, plaintiffs filed suit against the Burlington Northern seeking to restrain it from discontinuing its segment of the California Zephyr. A temporary restraining order was granted and the case was consolidated with other cases pending before the court. On April 3, 1970, plaintiffs' request for a preliminary injunction against the Burlington Northern was denied by the court.

Plaintiffs contend that the defendants failed to invoke the jurisdiction of the Interstate Commerce Commission because the railroads did not send notices to the Governors of all the states between Chicago, Illinois, and San Francisco, California, nor post notices in all the stations along the entire route as required by Section 13a(1) [49 U.S.C. § 13a(1)].[1] The Interstate Commerce

---

1. 49 U.S.C. § 13a(1):

A carrier or carriers subject to this chapter, if their rights with respect to the discontinuance or change, in whole or in part, of the operation or service of any train or ferry operating from a point in one State to a point in any other State or in the District of Columbia, or from a point in the District of Columbia to a point in any State, are subject to any provision of the constitution or statutes of any State or any regulation or order of (or are the subject of any proceeding pending before) any court or an administrative or regulatory agency of any State, may, but shall not be required to, file with the Commission, and upon such filing shall mail to the Governor of each State in which such train or ferry is operated, and post in every station, depot or other facility served thereby, notice at least thirty days in advance of any such proposed discontinuance or change. The carrier or carriers filing such notice may discontinue or change any such operation or service pursuant to such notice except as otherwise ordered by the Commission pursuant to this paragraph, the laws or constitution of any State, or the decision or order of, or the pendency of any proceeding before, any court or State authority to the contrary notwithstanding. Upon the filing of such notice the Commission shall have authority during said thirty days' notice period, either upon complaint or upon its own initiative without complaint, to enter upon an investigation of the proposed discontinuance or change. Upon the institution of such investigation, the Commission, by orders served upon the carrier or carriers af-

Commission and the defendants interpret Section 13a(1) as only requiring each individual railroad to notify the Governors of the states in which it operates and each railroad may proceed under Section 13a(1) independently of the other railroads which together make up an entire train. Southern Pacific Co. Discontinuance of Trains—Ogden, Utah, and Oakland, California, 333 I.C.C. 525 (1968). The Commission's interpretation is based on the concept that "train" as used in Section 13a(1) means one that is operated by one railroad between two or more states. It is our opinion that such interpretation is in direct conflict with the literal language of the statute.

The statute begins "A carrier or carriers * * * [whose] * * * rights with respect to the discontinuance * * * of the operation * * * of any [interstate] train * * * are subject to any provision of the constitution or statutes of any State * * * may * * * file with the Commission and * * * mail to the Governor of each state in which such train is operated * * *." The logical reading of this statute is that more than one carrier can be a part of a single "train," otherwise the plural "carriers" would have no meaning. The Commission claims that such interpretation negates the policies behind the Transportation

Act of 1958 in enacting Section 13a(1). Section 13a(1) was enacted in order that railroads would no longer have to obtain separate permission from each state regulatory agency in seeking to discontinue passenger trains and thereby avoid both the lack of uniformity and the long delay involved in such a procedure. The purpose of Section 13a(1) was to shift the venue from the state regulatory agencies to the Interstate Commerce Commission and at the same time permit the sates involved to present their objections to the Commission. See New Jersey v. New York, Susquehanna & Western Railroad Co., 372 U.S. 1, 83 S.Ct. 614, 9 L.Ed.2d 541 (1963). Requiring the railroads to notify all the states along the entire route of the train does not shift the venue back to the state commissions, but assures that all the states may be heard as to their objections. Section 13a(1) did not establish its own national standards nor attempt to circumscribe the rights of the states in presenting their case.

Further, the Commission's objection that such an interpretation of Section 13a(1) will put an undue burden on the railroads is unfounded. We are not requiring, for example, the Western Pacific to notify the Governors of all the states between Chicago and San Francisco and to post notices in all the stations along the route. Rather, we conceive of

fected thereby at least ten days prior to the day on which such discontinuance or change would otherwise become effective, may require such train or ferry to be continued in operation or service, in whole or in part, pending hearing and decision in such investigation, but not for a longer period than four months beyond the date when such discontinuance or change would otherwise have become effective. If, after hearing in such investigation, whether concluded before or after such discontinuance or change has become effective, the Commission finds that the operation or service of such train or ferry is required by public convenience and necessity and will not unduly burden interstate or foreign commerce, the Commission may by order require the continuance or restoration of operation or

service of such train or ferry, in whole or in part, for a period not to exceed one year from the date of such order. The provisions of this paragraph shall not supersede the laws of any State or the orders or regulations of any administrative or regulatory body of any State applicable to such discontinuance or change unless notice as in this paragraph provided is filed with the Commission. On the expiration of an order by the Commission after such investigation requiring the continuance or restoration of operation or service, the jurisdiction of any State as to such discontinuance or change shall no longer be superseded unless the procedure provided by this paragraph shall again be invoked by the carrier or carriers.

Section 13a(1) as demanding that all three railroads which operate the Zephyr must proceed jointly before the Commission. Section 13a(1) does not give the Commission the power to consider the plight of the financially unsound Western Pacific's segment of the Zephyr independently of the Burlington's profitable segment. We, therefore, conclude that Section 13a(1) requires that the carriers which together make up a "train" must proceed jointly in invoking the jurisdiction of the Commission.

The Commission also argues that the California Zephyr is not one train but three trains. We disagree.

The Burlington Northern (formerly the Chicago, Burlington & Quincy Railroad Company), the Denver and Rio Grande Western and the Western Pacific on October 16, 1945, entered into an agreement to jointly operate trains known as the California Zephyr between Chicago and San Francisco. Under the agreement the Burlington Northern provides Zephyr service between Chicago, Illinois, and Denver, Colorado. The Denver and Rio Grande Western operates the Zephyr between Denver and Salt Lake City, Utah, and the Western Pacific services the route between Salt Lake City and Oakland, California.

The Preamble to the agreement recited:

In view of the very substantial investment which will be required, the agreement contemplates the basic general theory that these California Zephyr Trains are to be considered as a unified operation of 3 partnership lines and that the over-all efficiency, service to the public and salability of the service will be the governing factors in connection with this operation rather than the individual convenience or preference of any one partner line. Such an agreement is necessary for mutual protection of all three partners against presently unforeseeable changes in management or ownership of any participating line.

The agreement further provides:

1. Six new trains will be provided. The trains will bear the name "California Zephyr". To insure uniform quality of service and simplified and economical maintenance these six sets of equipment are to be uniform in standards, * * * with the governing principle that the service offered will be that of the California Zephyr rather than that of any of the 3 partner railroads. * * *

2. The trains will be operated as through daily San Francisco-Chicago-San Francisco trains without change of consist enroute for a minimum period of five years from date of initial service.

3. Ownership of the equipment in the six new trains is to be divided between the three roads substantially on a basis of mileage prorate which will result in Western Pacific and C. B. & Q. each owning two complete trains, D. & R. G. W. owning one complete train, and individual cars in the sixth train to be owned by each of the three roads as stated in the attached table.

* * * * * *

5. The consist of each train is to be maintained intact between Chicago and Oakland and cars will not be cut in or out of the train except in emergency.

* * * * * *

When the final schedules have been agreed to by the three lines no material changes in time at initial or intermediate terminals will be made by any one line without the consent of the other two.

* * * * * *

10. Any joint national advertising shall carry names or monograms of participating lines and the text shall publicize the train and route features as the principal theme, advertising in local publications along each line shall be independently handled by each partner road.

The 1945 presidents' agreement is contrary to the Commission's finding

that the California Zephyr is made up of three separate trains. The California Zephyr was established in order to provide a uniform deluxe mode of transportation over a scenic portion of our country. The Preamble states that the Zephyr is to be a partnership which sacrifices "individual convenience or preference of any one partner line * * * " for "overall efficiency, service to the public and salability of service * * *." Ownership of the cars is divided between the railroads on the basis of mileage and "cars will not be cut in or out of the train except in emergency." Revenue and expenses are shared on the basis of agreed percentages. The railroads hold out the California Zephyr to the public as one overall train. Further, no changes in scedules of the Zephyr may be made without the consent of all three railroads.

Under the I.C.C.'s interpretation, the most profitable segment of the California Zephyr, the Burlington portion, has been excluded from the hearings of the Western Pacific, which suffered large deficits, and the hearings of the Denver and Rio Grande Western, which came close to breaking even. The result is that the Burlington may now take advantage of the orders in the other two cases since it would be anomalous for it to run its segment of the California Zephyr seven days a week while its partners need only run their segments three days a week. The acceptance of this argument by the Commission is manifested in its interim order of March 20, 1970, reducing the Burlington's California Zephyr service to three days a week.

For the foregoing reasons, we conclude that the I.C.C.'s finding that the California Zephyr is not a single train operated by three carriers pursuant to an agreement is not supported by substantial evidence.

■ At the present time, however, with the filing of notices under Section 13a(1) by the Burlington on the Governors of all the states between Chicago, Illinois, and Denver, Colorado, and the posting of notices in the stations along the route, the Governors of all the states between Chicago, Illinois, and San Francisco, California, have been notified under Section 13a(1) as to proposed action of the railroads composing the California Zephyr service and jurisdiction under Section 13a(1) is now properly invoked. Although as of February 27, 1970, the I.C.C. had jurisdiction over the Zephyr, the ultimate policy behind Section 13a(1) would be defeated unless the California Zephyr cases are remanded to the I.C.C. for a consolidated hearing where the entire train is evaluated on the basis of one overall policy rather than allowing the I.C.C. to consider each railroad's segment separately and independently. Since jurisdiction in the I.C.C. under Section 13a(1) has now been properly invoked, there is no question that we have the power to remand the case to the Commission for further proceedings. State of Vermont v. Boston & Maine Corp., 269 F.Supp. 80 (D.Vt. 1967). During the pendency of the consolidated proceedings before the Commission, we conclude that we should not order restoration of full Zephyr service. Rather such action should be left to the Commission.

■ The Western Pacific Railroad Company has filed a motion to dismiss under F.R.Civ.P. 12(b) and a motion for summary judgment under Rule 56(b) of F.R.Civ.P. On February 11, 1970, the Commission ordered the Western Pacific to continue its segment of the Zephyr for a period of thirty days. Instead of allowing the Commission's order to operate the Zephyr expire, the Western Pacific filed a new Section 13a(1) notice on February 19, 1970, proposing discontinuance of its segment of the Zephyr. The Commission in its discretion did not investigate and as a result, the Western Pacific contends that there is no I.C.C. order for this court to review. City of Chicago v. United States, 396 U.S. 162, 90 S.Ct. 309, 24 L. Ed.2d 340 (1969). However, the Western Pacific's notice of February 19, 1970, did not properly invoke the juris-

diction of the I.C.C. Such jurisdiction was not properly invoked as to the California Zephyr until the Burlington Northern filed its notice on February 27, 1970. We certainly have jurisdiction to determine whether Section 13a(1) was complied with and in doing so we have the power to remand the entire proceedings, including those involving the Western Pacific, to the I.C.C. for consolidated action. *Cf.* New York, Susquehanna & Western Railroad Co. v. United States, 200 F.Supp. 860 (D.N.J. 1961), reversed on other grounds sub nom. New Jersey v. New York, Susquehanna & Western Railroad Co., 372 U.S. 1, 83 S.Ct. 614, 9 L.Ed.2d 541 (1963).

█ The Southern Pacific, the Union Pacific and the Chicago, Milwaukee and St. Paul Railroads operate the City of San Francisco between Chicago, Illinois, and Oakland, California. Prior to 1960, the City of San Francisco was operated as a single unit train which was designed to meet the needs of business and professional people. The schedules were structured such that only one business day was consumed in travel, i.e., the trains would leave in the afternoon and arrive at their destinations the morning of the second day. *See* Southern Pacific Discontinuance—Ogden, Utah, and Oakland, California, 333 I.C.C. 525, 527, 537–538 (1968). The agreement between the railroads entered into in 1957 did not provide for the same type of joint venture that existed in the case of the California Zephyr. For example, there was no provision as to quality and uniformity of service. Further, beginning in the fall of 1960, the operation of the City of San Francisco was altered such that each railroad operated its own segment of the train with various cars being switched on and off depending on their destinations. Many of the cars did not originate in Chicago or Oakland but were added from connecting trains along the route,[2] and at least half the cars carried by the Union Pacific east of Ogden had either as their point of origin or point of destination, Los Angeles, California.

The only evidence we find to support a conclusion that the City of San Francisco between Chicago and Oakland is one train under Section 13a(1) is that it bears one name. We do not think that this is sufficient to support such a conclusion and, therefore, we find that the notice provisions were satisfied and the I.C.C. had jurisdiction under Section 13a(1) to reduce the Southern Pacific's segment to three days a week. The plaintiffs here do not attack the substantive holding of the Commission in respect to the Southern Pacific, and, therefore, we affirm the Interstate Commerce Commission's order as to the Southern Pacific Railroad Company's trains numbers 101 and 102.

An order consistent with this opinion is filed simultaneously herewith.

2. For example, in the summer of 1966 the City of San Francisco from Ogden, Utah, to Oakland, California, consisted of the following:

|  |  | Point of Origin |  |
|---|---|---|---|
| 2 | Storage mail | Council Bluffs, Iowa | —Oakland |
| 1 | Storage mail | New York | —Oakland |
| 1 | Storage mail | Chicago | —Oakland |
| 1 | 60' RPO | Chicago | —Oakland |
| 1 | Baggage-Dorm | Ogden | —Oakland |
| 1 | Chair car | Ogden | —Oakland |
| 2 | Chair cars | Kansas City | —Oakland |
| 1 | Chair car | St. Louis, Missouri | —Oakland |
| 6 | Chair cars | Chicago | —Oakland |
| 1 | Automatic Buffet | Ogden | —Oakland |
| 1 | Dome-lounge | Ogden | —Oakland |
| 1 | Diner | Ogden | —Oakland |
| 4 | Standards | Chicago | —Oakland |

## ORDER

The above cause having come on for hearing before a statutory three-judge court, and the court upon consideration of the record, briefs and arguments of the parties, now having filed its opinion on the 4th day of June, 1970.

It is hereby ordered, adjudged and decreed:

That the cause against the Western Pacific Railroad Company, the Denver and Rio Grande Western Railroad Company and the Burlington Northern Inc. be remanded to the Interstate Commerce Commission for further proceedings consistent with the opinion filed this 4th day of June, 1970;

That pending the Interstate Commerce Commission's commencement of proceedings, the operation of the CALIFORNIA ZEPHYR should continue on its present schedule;

That plaintiffs' motion to enjoin and set aside the order of the Interstate Commerce Commission as to the Southern Pacific Company is denied and the order of the Interstate Commerce Commission as to the Southern Pacific Company is affirmed.