In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1445

UNION PACIFIC RAILROAD COMPANY,

*Plaintiff-Appellee,*

*v.*

REGIONAL TRANSPORTATION AUTHORITY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 19 C 7957 — **Jorge L. Alonso**, *Judge.*

ARGUED OCTOBER 31, 2022 — DECIDED JULY 26, 2023

Before EASTERBROOK, JACKSON-AKIWUMI, and LEE, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* The Regional Transportation Authority (RTA), an agency established by the State of Illinois, oversees or operates the Chicago Transit Authority, the Pace bus system, and Metra, a railroad that offers passenger service over 11 lines radiating from Chicago. (Technically Metra is the RTA's Commuter Rail Division; we use the short

name by which the service does business.) This case concerns Metra's service on three lines of track owned by Union Pacific Railroad.

Metra owns the rolling stock, while Union Pacific supplies the track, the work force, and the ticket sales. Money from tickets goes to Metra, which pays Union Pacific a fee for its services. Perhaps believing that this fee is too small, Union Pacific notified Metra that it would discontinue its services. Then Metra could close these lines, operate the trains through its own staff, or find someone else willing to handle these tasks. Metra replied that Union Pacific cannot drop the service unless relieved of its obligations by the Surface Transportation Board. And as legislation in 1995 (the ICC Termination Act, which the parties call ICCTA) repealed 49 U.S.C. §§ 10908 and 10909, the only statutes giving the Board any authority over the discontinuation of passenger service, Metra contends that the Railroad is locked into its relation with Metra.

The Railroad, by contrast, contends that the repeal of §§ 10908 and 10909 deregulated the provision of passenger rail service, so that today railroads and air carriers alike can end passenger service when business considerations dictate. Federal law requires the Board's permission to abandon all service over a line of track, 49 U.S.C. §10903(a)(1), but the Railroad states (and Metra does not deny) that it will continue freight service, so the three lines will not be abandoned. The Railroad adds that, if there is any common carrier in northern Illinois' suburban-rail business, that status belongs to Metra. Riders believe that they are dealing with Metra: its name is on the cars, locomotives, tickets, and ads for the service; the engineers and conductors wear Metra's livery; and it owns the rolling stock.

Union Pacific asked a district court for a declaratory judgment that it is entitled to cease providing services to Metra. The district court obliged and denied Metra's belated request to add a counterclaim. 2020 U.S. Dist. LEXIS 222094 (N.D. Ill. Aug. 27, 2020); 2021 U.S. Dist. LEXIS 182492 (N.D. Ill. Sept. 23, 2021); 2022 U.S. Dist. LEXIS 52614 (N.D. Ill. Feb. 17, 2022).

The court's first opinion addressed what is also an issue on appeal: whether it should defer to the Board's primary jurisdiction. The court answered no, because the dispute does not require any findings of fact by an agency. See *United States v. Western Pacific R.R.*, 352 U.S. 59 (1956) (discussing the requirements for referral to an agency under the doctrine of primary jurisdiction).

The Board concurs with the district judge. Metra asked the Board to issue a declaratory order requiring the Railroad to continue providing its passenger services. The Board held the request in abeyance pending the judicial decision (the suit had been filed before the administrative proceeding). It remarked that "the federal district court has concurrent jurisdiction to resolve the common carrier question". *Commuter Rail Division of the Regional Transportation Authority*, No. FD 36420 (STB Aug. 5, 2020), at 2. (The district court's subject-matter jurisdiction comes from 28 U.S.C. §1331 and 49 U.S.C. §11704(b), (c)(1), which allows the judiciary to enforce carriers' obligations.) Because the Board does not see itself as having primary authority over this dispute, and judicial resolution does not depend on any factual disputes that the Board must resolve, the court need not wait for the Board to act.

In this court Metra advances a different argument. It contends that Union Pacific lacks a case or controversy within the scope of Article III. Metra asserts that this litigation is just

about establishing a framework that will affect the price of service that the Railroad plans to continue providing. But that's not what Union Pacific says. It contends that it is entitled to cease running trains for Metra and that it *wants* to stop, but that it is concerned about the potential penalties for doing so if Metra is right. The parties are at odds about a legal issue with concrete consequences for them. Resolving such disputes is a main function of the declaratory-judgment statute, 28 U.S.C. §2201, which does not exceed constitutional bounds. See, e.g., *303 Creative LLC v. Elenis*, No. 21–476 (U.S. June 30, 2023); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937).

Metra may be right that the parties will return to the bargaining table after their legal rights have been fixed, but that is true of all litigation: a winning tort plaintiff may accept less in order to avoid an appeal; a winning ex-worker in a Title VII case may decide not to return to work at the discriminatory employer; a mine operator told by a court that the surface owner also holds the mineral rights may choose to buy them; and so on. That people bargain in the shadow of the law does not prevent their disagreements about legal entitlements from posing justiciable controversies.

The merits are straightforward, as the district court recognized. Between 1887, when the Interstate Commerce Commission was created, and 1995, when it was abolished, the Commission's approval (or that of a state) was required for abandonment of rail service over a given line. Details varied as time passed, but few of those differences matter. In 1958 Congress for the first time allowed the Commission to approve the discontinuation of some services while the line itself remained in use. See *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451 (1985); *New Jersey v. New*

*York, Susquehanna & Western R.R.*, 372 U.S. 1 (1963). By 1980 the prevailing statutes (later recodified at 49 U.S.C. §§ 10908 and 10909) allowed the Commission discretion over proposals to discontinue particular interstate services (§10908) and intrastate services (§10909). Had Union Pacific wanted to end its commuter rail operations before 1995, those would have been the governing statutes, and the Commission's approval would have been essential.

But in 1995 Congress abolished the Commission and repealed many of the statutes it had administered. It created the Board to superintend a smaller portfolio of statutes and rules—for one goal of the 1995 amendments was to deregulate rail transportation, so that it could better compete with air, water, and truck transportation, industries that had been deregulated years earlier. As of 1995 "it is the policy of the United States Government … to reduce regulatory barriers to entry into and exit from the [rail] industry". 49 U.S.C. §10101(7). Sections 10908 and 10909 vanished and were not replaced. The only remaining regulatory control over abandonment of service is 49 U.S.C. §10903, which deals with the sort of abandonment that leaves a line of track without service. (Section 10903(a)(1)(B) deals with discontinuation of all service, and §10903(a)(1)(A) with tearing up the track and turning rails into trails or roads.) The Board now holds sole authority over abandonments of these kinds; state authority has been preempted by 49 U.S.C. §10501.

These changes leave Metra without a legal hook. To the extent that Union Pacific is a common carrier—rather than an independent contractor of Metra, which is the carrier from passengers' perspective—it has unfettered authority to discontinue any particular service without the Board's approval,

as long as it does not take a step covered by §10903. Because Union Pacific proposes to keep the rails in place and continue running freight trains over them, §10903 does not subject its passenger operations to the Board's abandonment authority. So far as federal law is concerned, then, Union Pacific is entitled to proceed as it proposes.

The Supreme Court held in *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), that the deregulation of airline service, which came with a preemption clause similar to §10501, does not prevent air carriers from making contracts that will be governed by state law and does not prevent the beneficiaries of those contracts from enforcing them against the carriers. After the close of discovery in this suit, Metra proposed to file a counterclaim that would rest on one or more contracts between it and Union Pacific. The district court declined to allow this belated complication, first because Metra had known for years about the contracts (and had mentioned them throughout the suit) and second because they do not do it any good. 2021 U.S. Dist. LEXIS 182492 at *30–33. That decision was not an abuse of discretion, and we can rely on the second reason alone (if only to prevent the end of the federal suit from becoming the start of a state-court suit).

One problem for Metra is that the controlling contract, signed in 2010, has long ago expired. The parties extended it occasionally, and Metra points to a clause in the 2017 extension providing:

> The Grantee agrees to use its best efforts to continue to provide, either directly or by contract or service agreement, as the case may be, the service(s) for which these Project Facilities are being acquired or constructed … . No reduction or termination of such service shall be made without compliance with all applicable statutory and regulatory provisions.

Metra reads this as a promise by Union Pacific to continue service until the Board signs off. But this is not what it says. It refers to "compliance with all applicable statutory and regulatory provisions." We have already explained that Union Pacific has complied with every legally required step (of which there are none). That federal law does not erect any barrier on the way to discontinuation of a given service does not mean that discontinuation is impossible. Just as important, the word "Grantee" in this passage, and the document as a whole, refers to Metra, not Union Pacific. It is a promise *by Metra* to the Railroad, not the other way around.

Some older contracts contain different language, but they have long expired or been superseded (or both). Metra invokes a contract signed in 1978, when the Commission's permission was needed for abandonment. The 1978 contract is between Metra and the Chicago & North Western Railroad, which then operated the commuter service. This was the year that Metra took over the operation and the Railroad became Metra's contractor. (Union Pacific merged with the Chicago & North Western in 1995, which is why Union Pacific is the party today.) One clause in this agreement provides:

> In the event no Service Agreement is in effect, [Union Pacific] shall provide Commuter Rail Service over or upon the Project Facilities in accordance with its common carrier obligations. Reduction or termination of such service may be made only upon compliance with all applicable statutory and regulatory provisions.

Because Union Pacific has declined to renew its periodic contracts with Metra, the condition of this paragraph—that "no Service Agreement is in effect"—has been satisfied. Any reduction in service on Union Pacific's part thus depends on "compliance with all applicable statutory and regulatory

provisions." But, as we have explained, Union Pacific has complied with all "applicable" statutes and regulations.

It would make little sense to read this contractual language to mean "all statutes and regulations applicable in 1978" as opposed to "all statutes and regulations applicable at the time of the reduction or termination." All it can ever mean to "comply" with the law is to do what the law commands on the date of the action. Using the forms of repealed statutes is not "compliance" with any set of legal requirements.

Union Pacific is not bound by any contractual promise to keep providing rail services to Metra for the indefinite future. The parties' contracts have start and end dates, which both sides can enforce.

AFFIRMED